**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| VOTE.ORG, *et al.,* | |
| Plaintiffs, | |
| v. | Civil Action No.: 1:22-cv-01734-JPB |
| GEORGIA STATE ELECTION BOARD, *et al.,* | |
| Defendants. | |

**STATE DEFENDANTS' BRIEF IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 2

ARGUMENT ...................................................................................... 7

   I.    Plaintiffs Lack Standing.................................................................... 7

        A.    Plaintiffs lack Article III standing as to State Defendants as they are unable to establish any injury traceable to or redressable by those Defendants. ..................... 8

               1.    Because the responsibility for accepting or rejecting absentee-ballot applications falls to counties, there is no injury traceable to or redressable by State Defendants. .................................... 8

               2.    Sovereign immunity has not been abrogated for the Materiality Provision. ................................. 9

        B.    Plaintiffs lack any injury sufficient to establish Article III standing as to any Defendant. ........................... 10

               1.    Plaintiffs have failed to show any injury from the pen and ink requirement. ............................... 11

               2.    Plaintiffs failed to show any injury as a matter of law because there is no right to vote by mail. ............... 13

               3.    Plaintiffs GARA and RMC failed to show injury to members. ....................................................... 14

               4.    Plaintiffs Vote.org and PUSA also failed to show injury through diversion of resources. .......................... 16

        C.    Plaintiffs Vote.org and PUSA lack prudential or third-party standing. ......................................................... 21

   II.    Plaintiffs Have No Private Right of Action Under the Materiality Provision. ................................................... 23

   III.   State Defendants Are Entitled to Summary Judgment on the Merits of Plaintiffs' Claims. ............................................. 25

    A.    Georgia has compelling and important interests in how persons sign the oath when applying for an absentee-by-mail ballot.................................................................. 26

    B.    Plaintiffs are unable to establish that the pen and ink signature requirement violates the Materiality Provision.................................................................. 30

        1.    The Materiality Provision is limited to determining qualifications to vote and not general regulations for requesting an absentee ballot.............. 31

        2.    Even if the Court views the Materiality Provision as applying to the method of signature on the absentee ballot application, such a requirement is material to obtaining an absentee-by-mail ballot......... 34

CONCLUSION.................................................................... 40

CERTIFICATE OF COMPLIANCE.................................................. 43

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Ala. State Conf. of NAACP v. Alabama,*
949 F.3d 647 (11th Cir. 2020) ......................................................... 9

*Allen v. Cooper*, 140 S. Ct. 994 (2020)............................................... 10

*Allen v. Milligan*, 599 U.S. 1 (2023)................................................... 24

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .................................... 31

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment,*
86 F.4th 1204 (8th Cir. 2023)........................................................ 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................. 11

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021).................*passim*

*Burdick v. Takushi*, 504 U.S. 428 (1992)...................................... 31, 34

*City of S. Mia. v. Governor of Fla.*, 65 F.4th 631 (11th Cir. 2023) ..........*passim*

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)........................... 12

*Common Cause v. Thomsen*, 574 F. Supp. 3d 634 (W.D. Wis. 2021) ............. 38

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979) ........................ 9

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ............ 33, 34, 36

*D.H. Pace Co. v. OGD Equip. Co.*, 78 F.4th 1286 (11th Cir. 2023) ................ 21

*Democratic Cong. Campaign Comm. v. Kosinski,*
614 F. Supp. 3d 20 (S.D.N.Y. 2022)............................................... 24

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) ....................... 37

*Egbert v. Boule*, 596 U.S. 482 (2022) .............................................. 25

*Fla. State Conf. of NAACP v. Browning,*
522 F.3d 1153 (11th Cir. 2008) ......................................... 7, 24, 39

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ....................................................................... 14

*Ga. Republican Party v. SEC*, 888 F.3d 1198 (11th Cir. 2018) ............ 7, 14, 16

*Ga. Republican Party v. Sec'y of State for Ga.*,
   No. 20-14741-RR, 2020 WL 7488181 (11th Cir. Dec. 21, 2020) .................... 8

*Ga. Shift v. Gwinnett County*,
   No. 1:19-cv-01135-AT, 2020 WL 864938 (N.D. Ga. Feb. 12, 2020) ............... 9

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) ............... 9

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) .................................................... 23

*Highland Consulting Grp., Inc. v. Minjares*,
   74 F.4th 1352 (11th Cir. 2023) ....................................................................... 21

*Howlette v. City of Richmond*, 485 F. Supp. 17 (E.D. Va. 1978) .................... 37

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) ..................... 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................ 21, 22

*McDonald v. Bd. of Election Comm'rs of Chi.*,
   394 U.S. 802 (1969) ........................................................................................ 13

*McDonald v. S. Farm Bureau Life Ins. Co.*,
   291 F.3d 718 (11th Cir. 2002) ....................................................................... 23

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981) ............................................................................................ 23

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022) ............................................... 24

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020) ....................................................... 7, 10, 11, 12

*Ne. Ohio Coal. for the Homeless v. Husted*,
   837 F.3d 612 (6th Cir. 2016) ......................................................................... 24

*New Ga. Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) ................ 13

*Ni v. Slocum,* 127 Cal. Rptr. 3d 620 (Cal. Ct. App. 2011) .............................. 29

*Org. for Black Struggle v. Ashcroft*,
   493 F. Supp. 3d 790 (W.D. Mo. 2020) ........................................................... 37

*Polkey v. Transtecs Corp.*, 404 F.3d 1264 (11th Cir. 2005) ............................ 22

*Prigmore v. Renfro*, 356 F. Supp. 427 (N.D. Ala. 1972) .................................. 13

*Raines v. Byrd*, 521 U.S. 811 (1997) .................................................................. 7

*Ritter v. Migliori*, 142 S. Ct. 1824 (2022) ......................................................... 31

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ........................................ 21, 24

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................ 8, 12

*Tex. Democratic Party v. Hughs*,
 860 F. App'x 874 (5th Cir. 2021) ................................................................. 10

*Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095
 (N.D. Fla. Oct. 30, 2023) ........................................................................*passim*

*Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2023) ................................... 33, 37

*Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) .................................*passim*

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ............................................................ 24

**Statutes**

52 U.S.C. § 10101 ....................................................................................*passim*

52 U.S.C. § 10308 ............................................................................................ 23

Ala. Code § 17-11-4 ........................................................................................ 28

La. Stat. Ann. § 18:1306 ................................................................................ 28

Miss. Code. Ann. § 23-15-627 ...................................................................... 28

Mo. Ann. Stat. § 115.283 .............................................................................. 28

Mo. Ann. Stat. § 115.295 .............................................................................. 28

N.C. Gen. Stat. Ann. § 163-231 .................................................................... 28

O.C.G.A. § 10-12-5 ......................................................................................... 28

O.C.G.A. § 21-2-216 .................................................................................. 32, 38

O.C.G.A. § 21-2-31 ........................................................................................... 5

O.C.G.A. § 21-2-33.1 ........................................................................................ 5

O.C.G.A. § 21-2-33.2 ........................................................................................ 5

O.C.G.A. § 21-2-381 ................................................................................... 4, 29

O.C.G.A. § 21-2-381 (2018) ......................................................... 2

O.C.G.A. § 21-2-384 ................................................................. 8

O.C.G.A. § 21-2-386 ............................................................. 5, 8

S.C. Code Ann. § 7-15-220 ........................................................ 28

S.C. Code Ann. § 7-15-230 ........................................................ 28

**Regulations**

Ga. Comp R. & Regs. 183-1-14-0.10-.16 .......................................... 3

Ga. Comp. R. & Regs. 183-1-14-.12 ............................................... 3

**Other Authorities**

Ga. Sec'y of State,
   *Election List, Election Night Reporting* ........................................ 12

## INTRODUCTION

As the Supreme Court has recognized, part and parcel with the right to vote is the integrity of the voting process. *See, e.g., Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021). One part of that integrity requires that an eligible voter receive a ballot to vote only in the races for which that voter is eligible to vote. And that is why, in Georgia, when a voter requests an absentee-by-mail ballot, Georgia law requires the voter to sign the oath on the ballot application by hand with pen and ink. In doing so, the voter certifies that the individual is who (s)he claims to be; that the information provided is true; and that the voter understands the penalties, which are significant, for swearing to false information. This requirement is material to verifying the voter's eligibility to vote and to upholding the integrity of Georgia's no-excuse absentee-by-mail system. Accordingly, State Defendants are entitled to summary judgment.

Indeed, Plaintiffs' own position implicitly admits the materiality of the oath requirement: They do not challenge the requirement that voters sign the oath on the absentee-ballot application. Rather, they make the policy suggestion that an *electronic* signature, such as a typed, digitally imaged, or some other form of computer-generated signature, should suffice. But Plaintiffs do not assert a claim based on any burden on voting, but only under the provision of the Civil Rights Act known as the Materiality Provision. And,

in addition to lacking standing or a private right of action, Plaintiffs are unable to establish that the specified method of signing the oath—by hand rather than via an electronic signature—is *immaterial* as a matter of federal law.

To the contrary, as demonstrated in detail below, a handwritten signature serves several important state interests. Not only does such a signature assist in verifying the identity of the voter, but it has also been shown to deter fraud, to ensure that voters take their obligations associated with the absentee-ballot application seriously, and to promote the integrity of the absentee-by-mail process. So the unrebutted evidence shows that the "wet signature" requirement *is* material. And for that reason, too, State Defendants are entitled to summary judgment.

## BACKGROUND

Senate Bill 202 (SB 202) is the latest in a line of election integrity measures enacted in response to concerns from the public and election officials regarding Georgia's election laws. After the 2018 gubernatorial election, groups and candidates accused the State of improper election administration, including the defeated candidate. State Defendants Statement of Undisputed Material Facts (SUF) ¶ 3 (Germany Decl. ¶¶ 4–7). At that time, the rules around absentee-by-mail ballot applications were less structured and voter signatures on the application were simply matched to the signature on file with election officials. *See* O.C.G.A. § 21-2-381(a)(1), (b)(1) (2018); SUF ¶ 2

(Germany Decl. ¶ 21-23, Ex. 2 (Ga. Comp. R. & Regs. 183-1-14-.12 (SEB regulation in force from 2016 to 2020)).

In response to the COVID pandemic in 2020, the State temporarily implemented emergency measures to ensure voters could safely vote during the pandemic and county election officials could handle the massive increase in absentee ballots. SUF ¶¶ 4–7 (Germany Decl. ¶¶ 11–15, Ex. 1 (Ga. Comp R. & Regs. 183-1-14-0.10-.16)). Pursuant to the State Election Board (SEB) Emergency Rule for the November 2020 general election and January 2021 run-off election, the Secretary of State created an online absentee ballot portal which allowed a voter to request an absentee-by-mail ballot entirely online. *Id*. Even though the portal allowed for typing a digital signature using a keyboard, a written signature, albeit one electronically captured, was still required for applications submitted in-person or by mail, email, or fax. The Emergency Rule specified that, "[e]xcept for the online portal developed by the Secretary of State's office that verifies voters as described above, all other absentee ballot applications shall contain an actual signature of the voter that shall be compared to the signature(s) contained in the voter's voter registration record," while allowing for "[s]ignatures made on touchpads or other images of the voter's actual signature" so long as it could be compared to the signature on file. *Id*.

3

Still, like 2018, the 2020 elections saw widespread accusations of voter fraud from the defeated candidate and supporters.  Election officials received numerous complaints and saw a marked decrease in public trust in the electoral process.  SUF ¶¶ 10–14 (Germany Decl. ¶¶ 30–32; Lindsey 30(b)(6) 43:16–44:2).  Further, during the 2020 elections and the dramatic, pandemic-induced increase in absentee voting, many voters seem to have forgotten they had requested absentee-by-mail ballots, leading to both administrative burdens and further accusations of fraud.  SUF ¶ 30 (Lindsey 30(b)(6) 46:6–47:5, 47:21–25; Germany Decl. ¶ 28).

To restore public trust, prevent future fraud, and increase administrative efficiency, Georgia enacted sweeping election reform through S.B. 202.  At issue here is O.C.G.A. § 21-2-381(a)(1)(C)(i), which eliminated the subjective signature matching rule, required more objective and secure I.D. verification, and specifically required absentee-ballot applicants to sign the oath by hand in pen and ink, affirming that they are qualified and have given accurate information on their application ("pen and ink requirement").  This requirement is to ensure that voters read and understand the oath, take it seriously, and provide accurate information, in addition to ensuring public faith in the process.  SUF ¶¶ 20–23, 29–31 (Germany Decl. ¶¶ 33, 35; Lindsey 30(b)(6) 36:16–22, 49:11–15; Srivastava Rep. ¶¶ 64–73, 77; Srivastava Dep. 31:7–16, 53:16–25, 188:1–17, 208:23–209:12; Brittian 30(b)(6) 82:25–83:4;

Smith 30(b)(6) 35:11–19, 70:16–23, 101:11–22).  It also helps deter fraud, a unique benefit to a handwritten signature over an electronic signature.  SUF ¶¶ 26–28, 39 (Lindsey 30(b)(6) 48:16–49:15; Srivastava Dep. 31:7–16, 53:16–25, 65:18–20, 188:1–17, 208:23–209:12; Srivastava Rep. ¶¶ 64–73, 77).

Since S.B. 202's enactment, its requirements have been administered by the counties, to the satisfaction of voters, and the pen and ink requirement is not something that has led to any significant number of complaints or confusion from voters.  SUF ¶¶ 50–53, 57 (Lindsey 30(b)(6) 20:2–12; Williams 30(b)(6) 128:16–24; Smith 30(b)(6) 96:23–97:2; Brittian 30(b)(6) 78:4–9). County officials are responsible for the processing of absentee ballots and absentee ballot applications.  O.C.G.A. § 21-2-386(a)(1)(B); SUF ¶¶ 59–62 (Lindsey 30(b)(6) 31:3–7, 34:4–10; Brittian 30(b)(6) 14:8–15; Williams 30(b)(6) 51:17–52:19).  SEB members do not appoint county officials and only enforce the Election Code through civil penalties and judicial proceedings following allegations of misconduct.  O.C.G.A. §§ 21-2-31, -33.1.  While the SEB can impose civil penalties, it is limited in how much it can impose per each violation and can only do so after notice and a hearing.  O.C.G.A. § 21-2-33.1(a)(2), (b). And it can only suspend county officials after years of violations.  *Id.* § 21-2-33.2(c).  Because the pen and ink requirement has not caused issues or confusion, the SEB has not taken any action against a county nor has it seen a need to issue any guidance or training on how to implement the clear

statutory language.   SUF ¶¶ 58, 63–67 (Lindsey 30(b)(6) 50:22–51:5, 54:14–55:2, 55:9–13, 56:2–5).   In fact, only the Secretary of State has provided guidance—on how to use the cure process for defective applications.  SUF ¶ 68 (Lindsey 30(b)(6) 50:2–24; Brittian 30(b)(6) 68:8–16; Ex. X).

In practice, moreover, the pen and ink requirement does not burden voters' right to vote.  Plaintiffs' expert, Dr. Mayer, was not able to identify a single individual prevented from obtaining an absentee-by-mail ballot due to the requirement. SUF ¶ 193 (Mayer Dep. 58:19–25, 116:2–13; Ex. Y).  And State Defendants' expert, Dr. Grimmer, noted without dispute from Plaintiffs that only 0.02% of all mail-in-ballot applicants throughout the entire state (55 people total) experienced a pen and ink rejection during the November 2022 general election and only five in the December 2022 runoff, or 0.002% of applicants.   SUF ¶¶ 204, 206–07 (Grimmer Rep. ¶¶ 7, 16, 29–30 & tbl. 1; Grimmer Dep. 30:1–10, 31:21–32:4).  And only 11 individuals in Georgia who experienced an initial pen and ink rejection across *all* 2022 elections, did not subsequently receive an absentee-by-mail ballot and did not vote for some unknown reason—or 0.00014% of Georgia registered voters.   SUF ¶¶ 211–12 (Grimmer Rep. ¶ 10; Grimmer Dep. 33:9–14, 97:9–98:16).   In short, the practical impact of this feature of SB202 is trivial.

## ARGUMENT

For three reasons, State Defendants are entitled to summary judgment. First, Plaintiffs lack standing, as their injuries are not traceable to or redressable by the SEB, the SEB has sovereign immunity, and Plaintiffs have not shown any cognizable injury. Second, given recent Supreme Court guidance, there is no private right of action under the VRA. Third, the pen and ink requirement is a well-supported procedural mechanism that confirms actual qualifications to vote and thus is not governed by the Materiality Provision, and it would be a material requirement even if the provision applied.

## I.      Plaintiffs Lack Standing.

As the Supreme Court has explained, "Art[icle] III standing is built on a single basic idea—the idea of separation of powers." *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (quotation marks and citation omitted). And in this Circuit, "[t]he constitutionally minimum requirements for standing are three-fold." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008) *abrogation on other grounds recognized by Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018). Plaintiffs "must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en

banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  None of these requirements is satisfied here.

> **A.    Plaintiffs lack Article III standing as to State Defendants as they are unable to establish any injury traceable to or redressable by those Defendants.**

Most fundamentally, Plaintiffs cannot show that State Defendants have harmed them or that an order from this Court can eliminate or redress their harm.

> **1.    Because the responsibility for accepting or rejecting absentee-ballot applications falls to counties, there is no injury traceable to or redressable by State Defendants.**

Plaintiffs' allegations falter out of the gate because counties—not State Defendants—process absentee-ballot applications, determine the validity of applications, and mail ballots to voters.  O.C.G.A. §§ 21-2-384(a)(2), 21-2-386.  Plaintiffs ask the Court to prevent State Defendants from refusing to accept absentee-ballot applications with electronic signatures.  But State Defendants do not accept (or refuse to accept) absentee-ballot applications.  *See* O.C.G.A. § 21-2-384(a)(2); *Ga. Republican Party v. Sec'y of State for Ga.*, No. 20-14741-RR, 2020 WL 7488181, at *2 (11th Cir. Dec. 21, 2020) (refusing to find traceability because county officials process absentee ballots); SUF ¶ 59 (Lindsey 30(b)(6) 31:3–7, 34:4–10).  Accordingly, if Plaintiffs are harmed by the pen and ink requirement, that harm is caused by the operations of county

officials, not State Defendants. *See Ga. Shift v. Gwinnett County*, No. 1:19-cv-01135-AT, 2020 WL 864938, at *5–6 (N.D. Ga. Feb. 12, 2020) (even if traceability, no redressability because a "federal court should not be 'the arbiter of disputes' which arise in elections" (citation omitted)). Plaintiffs' alleged injuries are thus not traceable to State Defendants. *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 927 (11th Cir. 2023) (traceability requires defendants take part "in a chain of events that lead to the plaintiff's injury"). And that is reason enough to dismiss Plaintiffs' claims against State Defendants.

### 2. Sovereign immunity has not been abrogated for the Materiality Provision.

At the very least, the State Election Board itself should be dismissed on sovereign immunity. Neither the Supreme Court nor the Eleventh Circuit has ever held that sovereign immunity has been abrogated for suits invoking the Civil Rights Act of 1964 ("CRA") or 52 U.S.C. § 10101, which was amended by the Voting Rights Act of 1965 ("VRA"). When the Eleventh Circuit held for the first time that the VRA abrogated sovereign immunity, the Supreme Court vacated. *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647 (11th Cir. 2020), *vacated*, 141 S. Ct. 2618 (2021). A Supreme Court decision "vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect." *County of Los Angeles v. Davis*, 440 U.S. 625, 634 n.6 (1979) (citation

9

omitted).  And other courts to address the issue have since concluded the Civil Rights Act does *not* abrogate sovereign immunity.  *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 877 n.3 (5th Cir. 2021) (unpublished) (remanding 52 U.S.C. § 10101(a)(2)(B) claim with instructions to dismiss for lack of jurisdiction because "Congress has not abrogated sovereign immunity for Civil Rights Act claims, as that Act does not provide 'unequivocal statutory language' abrogating state sovereign immunity." (quoting *Allen v. Cooper*, 140 S. Ct. 994, 1000 (2020))).

### B.     Plaintiffs lack any injury sufficient to establish Article III standing as to any Defendant.

Under Eleventh Circuit caselaw, organizations, like individuals, must establish distinct injury that is "concrete, particularized, and actual or imminent, rather than conjectural or hypothetical."  *Muransky*, 979 F.3d at 925 (footnote omitted).  An organization may do so "either through its members or through its own injury in fact."  *City of S. Mia. v. Governor of Fla.*, 65 F.4th 631, 637 (11th Cir. 2023) (cleaned up).

As membership organizations, the Communication Workers of America Local 3204 Retired Members Council ("RMC") and Georgia Alliance for Retired Americans ("GARA") have not shown that any of their members' rights to vote were harmed due to the pen and ink requirement.  Vote.org and Priorities USA ("PUSA") assert only organizational standing, claiming to have diverted

organizational resources on a Georgia print-and-mail campaign and general get out the vote advertising respectively, but have failed to show that they have diverted or will divert resources due to the pen and ink requirement itself. *See* SUF ¶¶ 129–43, 161–84 (Hailey 30(b)(6) 80:1–23, 137:1–25, 139:19–22, 142:25–147:1, 147:12–14, 151:12–152:10, 155:24–156:3, 207:3–13, 208:3–14; Grimsley 30(b)(6) 41:23–43:24, 73:10–22, 74:3–75:2, 93:19–94:2, 97:7–17, 102:19–104:21, 135:2–4).

### 1. Plaintiffs have failed to show any injury from the pen and ink requirement.

To show an "injury in fact," the Eleventh Circuit does not permit "[m]ere conclusory statements[.]" *Muransky*, 979 F.3d at 924 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Although intangible harm can sometimes evidence concrete injury, "*fears* of hypothetical future harm" do not suffice. *Id.* at 926 (cleaned up and emphasis added). In fact, for claims based on possible future harms, the Eleventh Circuit requires plaintiffs to "prove that their threatened injuries are '*certainly* impending.'" *City of S. Mia.*, 65 F.4th at 638 (citations omitted and emphasis added). Moreover, where, as here, a plaintiff attempts to "establish an injury in fact by showing that a statutory violation created a 'risk of real harm,'" plaintiffs must satisfy "a more demanding standard" by showing "a '*substantial* risk' that the harm will occur."

*Muransky*, 979 F.3d at 927 (quoting *Spokeo*, 578 U.S. at 341 and *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 414 n.5 (2013)) (emphasis added).

All that Plaintiffs have shown are fears of hypothetical future harm.  Not only is there no right to vote absentee, but the pen and ink requirement has not denied anyone their ability to vote even absentee-by-mail.  Indeed, no Plaintiff could identify a single voter (or member) who was denied the right to vote in the four statewide elections, and more than a dozen special elections, since the pen and ink requirement was enacted on March 25, 2021.[1]  SUF ¶¶ 73–78, 93–97, 144–45, 158–59, 187–89, 191 (Clancy 30(b)(6) 14:20–16:8, 36:18–37:4;  Scott  30(b)(6)  25:23–24,  45:12,  79:8–24,  81:12–24,  118:3-11; Grimsley 30(b)(6) 63:14–25, 80:2–15; Hailey 30(b)(6) 26:12–27:6, 170:18–172:7, 187:9–12).  Indeed, Plaintiffs' expert found only 52 pen and ink signature rejections in the four 2022 elections out of Fulton, DeKalb, and Gwinnett Counties, but even then, *all* of them still received an absentee-by-mail ballot. SUF ¶¶ 192–93 (Mayer Rep. at 5–6, tbl. 2; Mayer Dep. 58:19–25, 116:2–13; Ex. Y).  And in Dr. Grimmer's expanded statewide review, only 11 applicants in the November 2022 and December 2022 elections combined experienced a pen and ink rule rejection, did not obtain a ballot, and did not vote, constituting less than 0.0029% of applicants and 0.00014% of registered voters.  SUF

---

[1] *See* Ga. Sec'y of State, *Election List*, *Election Night Reporting*, https://results.enr.clarityelections.com/GA/ (last visited Feb. 17, 2024).

¶¶ 207, 211–12 (Grimmer Rep. ¶¶ 10, 16–17, 26 & tbl. 1).[2]  Such a vacuum speaks volumes—showing there is no "substantial risk" that the claimed harm will occur.

### 2. Plaintiffs failed to show any injury as a matter of law because there is no right to vote by mail.

Another reason Plaintiffs lack standing is that their claims wrongly *assume* a right to vote by mail, when in fact there is no such right.  *Accord Brnovich,* 141 S. Ct. at 2339 (when VRA was passed, States typically "allowed only narrow and tightly defined categories of voters to cast absentee ballots"); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1288 (11th Cir. 2020) (Lagoa, J., concurring); *Prigmore v. Renfro*, 356 F. Supp. 427, 432 (N.D. Ala. 1972), *aff'd*, 410 U.S. 919 (1973) ("The right to vote is unquestionably basic to a democracy, but the right to an absentee ballot is not.").  This is apparent from the Materiality Provision, 52 U.S.C. § 10101(a)(2)(B), which dictates that "[n]o person acting under color of law shall"

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

---

[2] There is no way to know why these 11 people did not vote,  just like there is no way to know why someone who received an absentee by mail ballot still chose not to vote.  SUF ¶¶ 211–14, 216 (Grimmer Dep. 33:15–18, 72:12–73:7, 77:4–7, 97:9–98:16; Mayer Resp. at 5.).

Because the pen and ink signature requirement relates to applying for an absentee-by-mail ballot, there is no injury to the right to vote under the Materiality Provision.  Thus, the pen and ink signature requirement in no way "den[ies] the right of any individual to vote."  *Id.*

### 3.    Plaintiffs GARA and RMC failed to show injury to members.

Even if there were a right to vote absentee, Plaintiffs "failed to produce concrete evidence that [the pen and ink requirement] is an imminent threat to their members or [an identifiable community that they seek to protect]."  *City of S. Miami*, 65 F.4th at 640.  Only GARA and RMC have members and claim that they have associational standing.  First Amd. Compl. [Doc. 96] ("FAC") ¶¶ 16–19.  Yet, to "establish associational standing, an organization must prove that its members "would otherwise have standing to sue in their own right."  *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  Under this doctrine of standing, an "organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'"  *Ga. Republican Party*, 888 F.3d at 1203 (cleaned up).  Yet Plaintiffs have not identified *a single member* who was unable to vote or even unable to vote absentee because of the pen and ink

signature oath requirement.  SUF ¶¶ 73–75, 92–93, 95–96 (Clancy 30(b)(6) 14:20–16:8; Scott 30(b)(6) 57:3–18, 81:12–14, 118:3–11).

Nor can RMC and GARA fulfill Article III's requirements by pointing to members who intend to vote absentee in the future and claiming they *might* have an issue due to lack of access to a printer.  *City of S. Mia.*, 65 F.4th at 640; FAC ¶¶ 17, 19.  Not having a printer is irrelevant to obtaining an absentee-by-mail ballot application.  SUF ¶ 44 (Williams 30(b)(6) 122:5–123:1).  More importantly, it is irrelevant to the issues here, as no voter was disqualified for not having a printer, the quintessential question under the Materiality Provision.

Here, as noted above, it is undisputed that *none of RMC's or GARA's members* had an absentee-ballot application rejected because of the pen and ink rule, let alone were denied the opportunity to vote.  Nor did any member claim that they would be unable to comply with the rule going forward.  *See* SUF ¶¶ 99, 111, 114 (Andrews 40:20–41:5; Simmons 33:11–19; Isom 28:14–18).  Even GARA president Kenny Bradford, despite not having a printer, was able to vote absentee four times in 2022.  SUF ¶ 75 (Clancy 30(b)(6) 54:17–57:16; Ex. AA).

Further, Plaintiffs assert that requiring a signature is "cumbersome," and suggest that this process has "multiple points of failure or delay."  FAC ¶ 19.  Not only was this not an issue for any RMC or GARA member, but the

mere possibility that something might go wrong in the future cannot satisfy the "certainly impending" injury-in-fact requirement, because "speculation does not suffice." *Ga. Republican Party*, 888 F.3d at 1202, 1204 (citations omitted). Thus, Plaintiffs lack standing to assert the interests of their members.

> ### 4. Plaintiffs Vote.org and PUSA also failed to show injury through diversion of resources.

Nor can any Plaintiff establish standing on a diversion-of-resources theory. Here, Plaintiffs "[a]t best … diverted resources to address fears of hypothetical future harm that is not certainly impending" and at worst diverted resources by "inflicting harm on themselves based on highly speculative' fears"—neither of which satisfies the requirements for standing. *City of S. Mia.*, 65 F.4th at 640 (cleaned up). Instead, "[t]o prove injury in fact based on an organization's diversion of resources to protect individuals from harm, the organizational plaintiff must prove *both* that it has diverted its resources *and* that the injury to the *identifiable* community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *Id.* at 638–39. Vote.org and PUSA fail the first element and ignore the second.

1. Vote.org pleaded only backward-looking costs, not the imminent future injury needed to establish standing for declaratory and injunctive relief

claims like this one.  Vote.org claims it had to drop its digital signature application in Georgia.  SUF ¶¶ 161–63, 176 (Hailey 30(b)(6) 147:12–14, 205:23–206:7, 207:14–17).  In its place, when a voter goes to Vote.org to complete the absentee-ballot application, the voter can either print the application themselves or request Vote.org to mail it to them.  Vote.org utilizes the print-and-mail program in other states, so Georgia was simply incorporated with other states such as Alabama that had a similar process. SUF ¶¶ 164–67 (Hailey 30(b)(6) 138:23–139:2, 109:21–110:19).  While unable to identify the number of Georgia voters who utilized that option, Vote.org claimed, without any documents to substantiate it, that the program cost them $60,000.  SUF ¶¶ 168–69 (Hailey 30(b)(6) 80:13–18).  Even still, Vote.org is unable to identity what program or project it had to divert resources from to cover this cost—thus meaning it cannot establish standing.  SUF ¶¶ 180–82 (Hailey 30(b)(6) 139:23–140:10, 142:25–147:1, 151:12–152:10, 208:3–14).  Nor can Vote.org quantify administrative or staff time to comply with the pen and ink requirement.  SUF ¶¶ 172–74, 178–79 (Hailey 30(b)(6) 137:1–25, 139:19–22).

This conclusion is not altered by a recent Fifth Circuit case rejecting Vote.org's challenge to Texas's wet-signature requirement but holding that Vote.org had organizational standing premised on its claim that it had to "shut down its [electronic signature] app" and divert resources from "staff time and

17

resources across its engineering, partnership, and operations teams that could have been spent on other efforts." *Vote.org v. Callanen*, 89 F.4th 459, 470–71 (5th Cir. 2023).  Here, Vote.org has *not* shut down its electronic signature application across the board and did not have to spend additional staff time to switch Georgia from its electronic signature application to the print-and-mail protocol because the latter program already existed.  *See* SUF ¶¶ 167, 176 (Hailey 30(b)(6) 138:23–139:2, 163:24–164:2, 234:7–235:20).  Further, as noted above, Vote.org has been unable to identify what efforts it was unable to undertake to make the switch from digital signature application to the print-and-mail program, or to identify what efforts it would need to divert resources from in the future.[3]  Absent such a showing, Vote.org lacks standing.

2. Likewise, PUSA only claims it spent more than it would have for twelve extra days on two get-out-the-vote advertisements between the 2022 general and runoff elections to maintain voter enthusiasm and turnout.  SUF ¶¶ 129–30 (Grimsley 30(b)(6) 35:4–36:13, 41:23–43:24, 45:1–46:10).  Yet neither ad in question even mentioned the pen and ink requirement.  SUF ¶ 132 (Grimsley 30(b)(6) 36:10–24, 44:2–6, 64:11–19, 97:18–24).  PUSA could

---

[3] VDO updates the state-specific sections of its website every election cycle and offers no evidence to support that resources were "diverted" to prepare the Georgia section due to the pen and ink rule.  This is because all of the staff time and engineering time was going to be spent updating the site anyway. SUF ¶¶ 151, 173, 175 (Hailey 30(b)(6) 103:6–16, 113:19–114:12, 134:25–137:25).

not identify how much less it would have spent on advertising in Georgia if not for the pen and ink requirement because its spending was within the average cost of its ad buys for statewide elections. SUF ¶¶ 134, 137, 140–41 (Grimsley 30(b)(6) 93:19–94:2, 105:3–5, 135:2–4). PUSA's claim that the Georgia ad buy caused them to spend less in 2023 in Wisconsin is simply without any supporting evidence. See SUF ¶ 142 (Grimsley 30(b)(6) 102:19–104:21).

3. Vote.org and PUSA similarly failed to show that their diversion of resources was to protect a community injured by the pen and ink requirement. *City of S. Mia.*, 65 F.4th at 638–39. Vote.org claims its electronic signature application can help those without a printer but with a smart phone or computer. But though the record "is rife with speculative fears of future harm," it "fails to establish that" *any* voters have been harmed by the pen and ink requirement. *Id.* at 640 ("Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." (cleaned up)). As noted above, Plaintiffs' expert identified a total of 52 people who had an absentee-by-mail application rejected for a pen and ink reason, but all of them ultimately received an absentee-by-mail ballot in that election and were able to vote. *See* SUF ¶¶ 192–93 (Mayer Dep. 58:19–25, 116:2–13; Ex. Y). Vote.org also identified no one who did not complete an absentee-ballot application, including through their website, because of the pen and ink rule. SUF ¶ 187 (Hailey 30(b)(6) 187:9–12). All apparent voters identified in this case for which

Plaintiffs have any knowledge either voted or identified a reason other than the pen and ink rule for why they did not vote.  SUF ¶¶ 144–45, 148–49, 188–91 (Hailey 30(b)(6) 26:12–27:6, 170:18–172:7, 186:22–187:12; Grimsley 30(b)(6) 63:14–25, 80:2–15, 109:15–111:9).

When faced with a lack of voters who had been unable to vote, PUSA presented a theoretical harm: Georgia registered voters who might choose not to vote at all because the pen and ink requirement is too cumbersome.  SUF ¶¶ 118, 149 (Grimsley 30(b)(6) 13:12–15, 109:15–111:9, 152:4–8).  But this is too speculative: there is no way to even guess whether the pen and ink requirement had any impact.  Given the few people who even suffered a pen and ink rejection, there is no basis to suggest the pen and ink requirement had any impact on voter turnout.  SUF ¶ 214 (Grimmer Dep. 21:14–21).

In short, Vote.org has failed to show any diversion of resources "closely connected" to "a legally cognizable Article III injury," while PUSA has "failed to prove [its advertising] was necessary to address an actual, non-speculative harm caused by [the pen and ink requirement]."  *City of S. Mia.*, 65 F.4th at 639–40.  Because neither Vote.org nor PUSA could "prove an injury from the law's actual application to the community the organization sought to support, any diversion was a 'self-inflicted' injury that [cannot] support standing." *Id.* at 639 (cleaned up).

### C.     Plaintiffs Vote.org and PUSA lack prudential or third-party standing.

Finally, even if Plaintiffs can show Article III standing, they still must have a valid cause of action under the Materiality Provision. *See D.H. Pace Co. v. OGD Equip. Co.*, 78 F.4th 1286, 1292 n.5 (11th Cir. 2023) (prudential standing inquiries actually ask whether plaintiffs have a statutory cause of action). In determining whether a plaintiff has a cause of action, "the Supreme Court has observed, 'a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Highland Consulting Grp., Inc. v. Minjares*, 74 F.4th 1352, 1359 (11th Cir. 2023) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). "[W]hether a plaintiff comes within the zone of interests requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 572 U.S. at 127. Thus, the question is one of straightforward statutory interpretation. *Id.*

Here, Vote.org and PUSA cannot demonstrate that their alleged injuries because the plain language of the Materiality Provision protects "the right of any *individual* to vote." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003) ("The statute protects an individual's right to vote[.]"); *but see Callanen*, 89 F.4th at 472 (though

ultimately losing on the merits, "Vote.org's position as a vendor and voting rights organization is sufficient to confer third-party standing"). And in the Eleventh Circuit, when "the statute's meaning on this point is clear and unambiguous, its plain language controls our analysis." *Polkey v. Transtecs Corp.*, 404 F.3d 1264, 1268 (11th Cir. 2005). Vote.org and PUSA are not voters, do not represent voters, and, in fact, have not identified a single voter who was not able to vote absentee, let alone vote at all, because of the pen and ink requirement. Thus, their organizational interest in preventing the continued diversion of their resources in response to the law in question falls outside the "zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129 (citations omitted); *see also Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095, at *3 (N.D. Fla. Oct. 30, 2023) (explaining that it would be absurd to read the Materiality Provision as "establishing a statutory claim for any plaintiff with Article III standing—no matter how tangentially affected by a Materiality provision violation"), *appeal docketed sub nom. Disability Rights Fla. v. Byrd*, No. 23-13727 (11th Cir. Nov. 13, 2023). And for that reason, too, they lack prudential standing.

## II.   Plaintiffs Have No Private Right of Action Under the Materiality Provision.

Even if they had standing, Plaintiffs lack a private right of action under 52 U.S.C. § 10101(a)(2)(B) and 42 U.S.C. § 1983.  As the Eleventh Circuit explains, the "central inquiry" in "determining whether a private remedy is implicit in a statute not expressly providing one" is "whether Congress intended to create, either expressly or by implication, a private cause of action." *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 722–23, 726 (11th Cir. 2002) (citations omitted).  And "[t]he bar for showing legislative intent is high." *Id.*

Plaintiffs here cannot meet this "high" bar. The evidence here rebuts the presumption that § 10101 is enforceable via § 1983 by establishing a comprehensive enforcement scheme in lieu of private suits.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 & n.4 (2002); *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981).  The text of § 10101 is not silent on remedies available for violating it:   In both the CRA and VRA, Congress created a comprehensive scheme for enforcing § 10101 by authorizing the U.S. Attorney General to enforce it with civil actions.  *See* 52 U.S.C. §§ 10101(c), (e) and (g); 10308(a), (d); *see also Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1216 (8th Cir. 2023) (explaining that VRA's sole enforcement mechanism is through the Attorney General), *petition for*

*reh'g and reh'g en banc denied*, No. 22-1395, 2024 WL 340686 (8th Cir. Jan. 30, 2024) (mem.).  Thus, § 10101(a)(2)(B) should not *also* be enforced by § 1983.  *See Fla. State Conf. of NAACP*, 522 F.3d at 1173 ("The text … and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent.").

The U.S. Supreme Court, moreover, has called the practice of implying rights of action into the VRA an "*ancien regime*."  *Ziglar v. Abbasi*, 582 U.S. 120, 131–32 (2017) (citation omitted).  True, twenty years ago the Eleventh Circuit disagreed and is part of a circuit split.  *Compare Schwier*, 340 F.3d at 1297; *Callanen*, 89 F.4th at 478; *Migliori v. Cohen*, 36 F.4th 153, 159 (3d Cir. 2022), *vacated*, 143 S. Ct. 297 (2022) (mem.); *with Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016); *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20 (S.D.N.Y. 2022) (CA2 district courts have found no private remedy).  But, addressing private remedies in the VRA, the Supreme Court recently said that "a fresh look at the statutory text is appropriate."  *Brnovich*, 141 S. Ct. at 2337; *see also id.* at 2350 (Gorsuch, J., concurring) ("open question" if private remedy in VRA); *see Allen v. Milligan*, 599 U.S. 1, 90 n.22 (2023) (Thomas, J., dissenting) (leaving question of private remedy in VRA for another day because it "was not raised in this Court").  This tracks the Supreme Court's recent explanation that it is "long past the heady

24

days in which [it] assumed … causes of action" and now "appreciate[s] more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (cleaned up).  And that is another reason State Defendants are entitled to summary judgment.

## III. State Defendants Are Entitled to Summary Judgment on the Merits of Plaintiffs' Claims.

State Defendants are also entitled to summary judgment on the merits.  As noted above, voters are required to sign the absentee-ballot application oath by hand with pen and ink.  Plaintiffs claim that requirement violates the Materiality Provision because, they assert, an electronic or digital signature *should* suffice.[4]  Plaintiffs thus do not challenge the requirement that an individual sign the oath, only the *manner* of signature.  FAC ¶ 39; SUF ¶¶ 81–83, 87, 116, 156, 158 (Hailey 30(b)(6) 13:19–14:13, 16:20–17:3; Grimsley 30(b)(6) 12:4–16; Clancy 30(b)(6) 23:10–24:6, 40:16–21; Scott 30(b)(6) 16:18–25).  But that claim fails.  The issue here is not whether the State *could* permit the use of an electronic signature on an absentee ballot application, but whether federal law says it *must*.  Because the form of signature carries

---

[4] Plaintiffs do not challenge the requirement that a voter use a pen rather than a pencil when signing by hand.  [FAC ¶ 39.]  Of course, the permanency and inalterability of a pen signature versus, for example, a pencil, makes the pen and ink requirement material and reasonable.  SUF ¶ 29 (Lindsey 30(b)(6) 45:3–22; State Defs.' First Interrog. Resp. at Nos. 1 & 2).

independent weight, SUF ¶¶ 32–34, 38 (Srivastava Rep. ¶¶ 64–67, 75, 77), and serves compelling governmental interests noted below, State Defendants are entitled to summary judgment.

### A. Georgia has compelling and important interests in how persons sign the oath when applying for an absentee-by-mail ballot.

The pen and ink signature requirement serves as part of Georgia's objective method of verifying voters' identity when applying for an absentee-by-mail ballot.

1. That requirement serves several important and compelling state interests.

*First*, even though the signature is not matched against the voter's signature on file, the signature itself is still part of the process of identifying the voter. SUF ¶¶ 19–20, 22 (State Defs.' First Interrog. Resp. Nos. 1 & 2; Brittian 30(b)(6) 82:25–83:4; Smith 30(b)(6) 101:11–102:1). This is because the voter, by signing the document, affirms the person is who he or she claims to be. SUF ¶ 31 (Brittian 30(b)(6) 82:25–83:4; Smith 30(b)(6) 35:11–19, 70:16–23, 101:11–22).

*Second*, it is designed to ensure the person submitting the application takes the oath to which the signature is affirming seriously. False swearing carries significant penalties to protect the integrity of the election process. Not only does the State not want voters to mistakenly submit false information,

but it also wants to take the information they submit seriously. SUF ¶¶ 23–24 (Lindsey 30(b)(6) 35:22–36:22, 45:3–22; Srivastava Rep. ¶¶ 62–69). A handwritten signature is proven to create an atmosphere where the signor takes the document more seriously than when they use electronic signatures. SUF ¶¶ 32–35 (Srivastava Rep. ¶¶ 62–67).

*Third*, a handwritten pen and ink signature helps deter fraud. It does so in several ways. Initially, studies establish that individuals who are required to use a handwritten signature are more likely to comply with the obligations they are attesting to in the document. SUF ¶¶ 33-34, 38 (Srivastava Rep. ¶¶ 62–69, 77); *see also,* Srivastava Rep. ¶ 6 ("the research showing that handwritten signatures have a greater propensity than electronic signatures to ensure the signor will abide by his or her obligations set out in the signed document as well as preventing fraud."). Additionally, it is harder to forge a handwritten signature while at the same time being easier to prove forgery from a handwritten signature than an electronic signature. SUF ¶¶ 28, 39 (Srivastava Rep. ¶¶ 69–73).

The absentee-by-mail application is completed away from an election official before being submitted electronically or through the mail. A ballot is then mailed to the voter with the completed ballot returned either by mail, via a dropbox, or dropped off in person at the county elections office. This all happens without any personal interaction between the voter and election

officials.  SUF ¶ 8 (Germany Decl. ¶¶ 24, 30).  Having the voter hand sign the oath assists in upholding the integrity of the process and ensures the person submitting the application takes his or her obligation to provide truthful information seriously.  SUF ¶¶ 19–24 (Germany Decl. ¶¶ 33, 35; Lindsey 30(b)(6) 35:22–36:22, 45:3–22, 49:11–15; Srivastava Dep. 31:7–16, 53:16–25, 188:1–17, 208:23–209:12; Srivastava Rep. ¶¶ 6, 62–73, 77).  All of these are not just important but compelling state interests.[5]

2.    Georgia's interests in requiring a handwritten pen and ink signature on the absentee ballot application oath is further supported by the laws around the use of electronic signatures and the empirical evidence supporting advantages of a handwritten signature over an electronic signature as set out in detail in Dr. Srivastava's unrebutted report.

*First*, under the Uniform Electronic Transaction Act of 1999, all parties to a transaction must agree to proceed electronically.  O.C.G.A. § 10-12-5(b);

---

[5] Indeed, many other states require physical signatures or even much more onerous signature requirements such as notarization by the local registrar. *See* Ala. Code § 17-11-4 ("each application shall be manually signed by the applicant"); Miss. Code. Ann. § 23-15-627 ("An absentee ballot application must have the seal of the circuit or municipal clerk affixed to it and be initialed by the registrar or his or her deputy in order to be used to obtain an absentee ballot."); S.C. Code Ann. §§ 7-15-220, -230 (physical application and witness to absentee ballot required); *see also* La. Stat. Ann. § 18:1306(E)(2) (voter and witness must attach "handwritten signature" to absentee ballot); Mo. Ann. Stat. §§ 115.283, 115.295 (notary needed to submit absentee ballot); N.C. Gen. Stat. Ann. § 163-231(a)(6) (two witnesses or notary required to witness signing absentee ballot).

Srivastava Rep. ¶ 25.  In short, while the law *permits* the use of electronic signatures in many circumstances, it does not *require* their use.  *See Vote.org v. Byrd,* 2023 WL 7169095, at *6 ("But the acceptance of electronic signatures in certain circumstances does not render the wet signature requirement immaterial in this circumstance."); Srivastava Rep. ¶¶ 36–38.  And that cuts decisively against Plaintiffs' argument that an electronic signature must be treated as a legally mandated option for voters.

*Second*, several state courts have found that laws requiring handwritten signatures in the election context are appropriate.  *See* SUF ¶ 40 (Srivastava Rep. ¶¶ 30–56).  Indeed, the California Court of Appeal found that the legislature, not the judiciary, "is the proper body to determine whether and how to incorporate this technology [electronic signatures], with its new risks and equal promise, into the process of initiative endorsement." *Ni v. Slocum,* 127 Cal. Rptr. 3d 620, 633 (Cal. Ct. App. 2011).  Here, Georgia law specifically mandates that a handwritten pen and ink signature is required when requesting an absentee-by-mail ballot.  O.C.G.A. § 21-2-381(a)(1)(C)(i).

*Third*, research establishes that a handwritten signature helps the signor take his/her obligations under the document seriously.  By contrast, research by Dr. Eileen Chou from the University of Virginia has demonstrated that using an electronic signature results in "the signer treating the document and resulting obligations with *less* seriousness."  SUF ¶ 32 (Srivastava Rep.

29

¶ 64).  The research also shows that those who "used a handwritten signature were less likely to engage in fraudulent or misleading behavior than those who executed a document using an e-signature."  *Id.*  Subsequent research confirms Dr. Chou's results.  SUF ¶ 35 (Srivastava Rep. ¶ 66).

For all these reasons, it is clear that requiring a voter to hand sign the absentee ballot application with pen and ink serves several compelling governmental interests.

**B.     Plaintiffs are unable to establish that the pen and ink signature requirement violates the Materiality Provision.**

In any event, under a proper reading of the law, Plaintiffs cannot establish any material issue of fact as to the lawfulness of the pen and ink requirement.   That is because the Materiality Provision applies only to determinations of whether a voter is qualified to vote, not to the mechanics of voting.  *See* 52 U.S.C. § 10101(a)(2)(B).  Alternatively, even if it did apply to run-of-the-mill voting rules, the Materiality Provision reaches only requirements that are not "material" to a voter's qualifications "under State law."  *Id.*  And here, because signing the absentee-by-mail ballot application oath by hand in pen and ink serves important governmental interests and is required by SB 202 to validly obtain an absentee ballot, it is, by definition, material under State law.

### 1. The Materiality Provision is limited to determining qualifications to vote and not general regulations for requesting an absentee ballot.

Based on its clear text, the Materiality Provision only bars election officials from determining that a person is not "*qualified* … to vote" based on an error unrelated to the State's voting qualifications. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). By its terms, this provision applies to "the requirements that must be met in order to register (and thus be 'qualified') to vote," not to "the requirements that must be met in order to cast a ballot that will be counted." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (mem.) (Alito, J., dissenting). Indeed, the Supreme Court has long recognized that election codes may properly contain provisions that "govern[] the registration and qualifications of voters" as well as "the voting process itself." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *see Burdick v. Takushi*, 504 U.S. 428, 433 (1992). And the text of the VRA narrows the Materiality provision far more than Plaintiffs suggest.

*First,* the Materiality provision prohibits states from disqualifying potential voters *from voting.* The provision applies only to an "error or omission" in an "application, registration, or other act requisite to voting" that affects a "determin[ation] whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). The surrounding provisions confirm this. *Id.* § 10101(a)(2)(A), (C) (focusing on discriminatory application of rules and

31

literacy tests).  It follows, therefore, that *qualified* voters who fail to follow state-law procedures for obtaining an absentee by-mail ballot cannot prevail under the Materiality Provision when their application is rejected (or they were provided with a provisional ballot and cure affidavit), not because they were found not "qualified," *id.*, but rather because they failed to comply with a "[m]ere inconvenience associated with the State's "reasonable means of pursuing legitimate interests." *Brnovich*, 141 S. Ct. at 2338, 2341.

This is the complete answer to Plaintiffs' claim here.  They claim that the *only* material qualifications are the person's being at least 18 years of age and a citizen of the United States and the State of Georgia.  FAC ¶ 39; O.C.G.A. § 21-2-216(a), (b).  But those qualifications are determined at registration, *see* Brittian 30(b)(6) 20:7–22:13, and *then* the person applying for an absentee ballot must demonstrate they are the validly registered voter by providing the information required on the absentee ballot application *and* signing the oath with pen and ink, just like an in-person voter must provide a photo ID.  SUF ¶¶ 31, 42 (Brittian 30(b)(6) 34:13–35:14, 82:25–83:4; Smith 30(b)(6) 35:11–19, 42:10–43:14, 70:16–23, 101:11–22; Ex. W).  That signature requirement, then, is not a qualification for voting under Georgia, it is simply a requirement for a voter to establish that (s)he is in fact the voter who has been previously found qualified and that (s)he remains qualified.

*Second*, under Plaintiffs' theory, "virtually every rule governing how citizens vote would [be] suspect[.]" *Vote.org v. Callanen*, 39 F.4th 297, 305–06 & n.6 (5th Cir. 2023) (rejecting such a reading, because unless a law directly determines a voter's qualifications, it is not "material"). Taking Plaintiffs' argument to its logical conclusion would obliterate clear guidelines every court in the country recognizes, including that verifying a voter's identity properly serves the state's interest in preventing fraud. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear"). A voter can certainly be required to identify him/herself when applying for an absentee-by-mail ballot for "[c]asting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. There is nothing in the Materiality Provision that prohibits the State from requiring a handwritten pen and ink signature on the oath when requesting an absentee-by-mail ballot.[6]

---

[6] Plaintiffs nevertheless claim that, because one way voters can return their absentee ballot applications is by fax or email, a process that effectively "digitizes" their signature, there is no justification for requiring that the signature be applied with pen and ink in the first place. [FAC ¶¶ 4, 39]. That argument misses the point. The law requires the voter to sign by hand with a pen and ink for the reasons noted above. It is this act of signing that was upheld in *Vote.org v. Byrd*, 2023 WL 7169095, and *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), as it promotes voter integrity and serves other

Indeed, States are not just permitted, but obligated, to establish rules for casting ballots apart from qualifications or eligibility to vote. *Burdick,* 504 U.S. at 433 (affirming that "government must play an active role in structuring elections … if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes" (cleaned up)). Voter identification requirements, including the pen and ink signature requirement here, are legitimate State requirements for obtaining an absentee-by-mail ballot, even when one is already qualified to vote. *Crawford,* 553 U.S. at 196–97. That is what Georgia has done here and it is entirely consistent with the Materiality Provision.

> **2.  Even if the Court views the Materiality Provision as applying to the method of signature on the absentee ballot application, such a requirement is material to obtaining an absentee-by-mail ballot.**

Alternatively, should the Court find that the Materiality Provision applies to the method of signing the oath on the absentee ballot application, under Georgia law the requirement for a voter to write his/her handwritten signature with pen and ink *is* material as a necessary requirement to obtaining an absentee-by-mail ballot. The absentee ballot application itself states very clearly that the signature must be in pen and that electronic signatures are

---

important governmental interests. *See also,* SUF ¶¶ 33–39 (Srivastava Rep. ¶¶ 62–70, 73, 78–79).

not allowed.  SUF ¶ 80 (Clancy 30(b)(6) 19:8–16, 23:1–9; Ex. W; Simmons Dep. 23:3–7).  Accordingly, rejecting a ballot application for failure to sign the oath with pen and ink or providing a provisional ballot with a cure affidavit does not violate the Materiality Provision because that provision only applies to "immaterial" conditions—and the pen and ink requirement is in fact material.

1.    Under this view of materiality, individuals who request an absentee-by-mail ballot are required to sign the oath on the application with pen and ink.  The voter cannot just leave the signature line for the oath blank. A signature violation (whether no signature or a non-pen and ink signature) will result in either the individual's being given the chance to fill out a new application properly or the individual receiving a provisional absentee ballot with a cure affidavit that requires the same basic identifying information and handwritten pen and ink signature.  SUF ¶ 41 (Brittian 30(b)(6) 64:8–10, 66:12–16; Ex. V).  Nothing in the Materiality Provision prevents Georgia from taking such common-sense steps to further its compelling state interests in preventing fraud and promoting integrity in the absentee-by-mail process and such measures do not deny anyone the right to vote.

This conclusion finds powerful support in a recent Fifth Circuit decision that evaluated a similar original hand signature requirement on voter registration cards, which Plaintiff Vote.org also challenged, and found the

requirement consistent with the Materiality Provision. *Callanen,* 89 F.4th at 489 (resolution of the issues as "comes down to whether requiring an original signature meaningfully, even if quite imperfectly, corresponds to the substantial State interest of assuring that those applying to vote are who they say they are"). In conducting its analysis, the court noted: "We must give weight to a state legislature's judgment when it has created 'evenhanded restrictions that protect the integrity and reliability of the electoral process.'" *Id.* (quoting *Crawford*, 533 U.S. at 189–90). Then, in upholding the requirement under the Materiality Provision, the court found:

> [F]irst, . . . Texas's interest in voter integrity is substantial. Second, that interest relates to the qualifications to vote – are the registrants who they claim to be? Finally, most voter registration forms likely are completed far from any government office or employee. That limits the methods of assuring the identity of the registrant. Though the effect on an applicant of seeing these explanations and warnings above the signature block may not be dramatic, Texas's justification that an original signature advances voter integrity is legitimate, is far more than tenuous, and under the totality of the circumstances, makes such a signature a material requirement.

*Id.*

Vote.org's similar challenge in Florida likewise failed. *Vote.org v. Byrd,* 2023 WL 7169095. There, Vote.org challenged a handwritten signature requirement on voter registration forms. *Id.* at *1 (citation omitted). Vote.org made the same arguments there as it makes here, namely that a pen and ink signature "bears no relation to the statutory qualifications" and "the act of

signing – rather than the method used – affirms the information provided as true and accurate." *Id.* at \*6.  But the District Court rejected those arguments, finding that because "original signatures carry different weight than other 'signatures,' society is replete with examples of original-signature requirements." *Id.* (citing *Callanen*, 39 F.4th at 308 ("Physically signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not.") and *Howlette v. City of Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978), *aff'd*, 580 F.2d 704 (4th Cir. 1978) ("[I]ndividual notarization requirement impresses upon the signers of the petitions the seriousness of the act of signing a petition ....")).  As a result, the court held that Vote.org could not "plausibly show that the wet-signature requirement is immaterial." *Id.*  The same is true here.[7]

The substantive requirement of Georgia law to sign the application by hand with pen and ink ends the inquiry under the Materiality Provision.  *See Org. for Black Struggle v. Ashcroft,* 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020)

---

[7] Similarly, in *Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006), the district court upheld not just the signature oath requirement, but also the need for a voter to check three boxes confirming specific aspects of the voter's qualifications as part of the voter registration process.  Both the signature oath and the check-boxes, while covering the same qualifications, were each material as they contained different information.  *Id.* at 1212–14.

(ruling that election officials "may reject applications and ballots that do not clearly indicate the required information required by [state law] without offending 52 U.S.C. § 10101(a)(2)(B)").  That is, *if* the Materiality Provision applies to the manner of signature on the absentee ballot application, as Plaintiffs claim, then the pen and ink requirement is necessarily "material to a determination whether an individual may vote" under Georgia law. *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 640 (W.D. Wis. 2021). Georgia law having made it so and for compelling state reasons, Georgia's law should be respected. *See Callanen*, 89 F.4th at 89.[8]

---

[8] Indeed, the Western District Court of Wisconsin rejected the very argument Plaintiffs make here on what it means to be a "qualified" voter.

> Common Cause Wisconsin apparently has in mind only the *substantive* voting qualifications, such as being a citizen, a resident of Wisconsin, and at least 18 years old. Common Cause Wisconsin is right that whether the individual's ID bears a signature is not a substantive qualification of this type.  But "qualified" in § 10101(a)(2)(B) is not limited to these substantive qualifications. …

> Under Wisconsin law, an individual is not qualified to vote without a compliant ID.  Defendants' straightforward argument squares with the statutory text: an individual isn't qualified to vote under Wisconsin law unless he or she has one of the forms of identification listed in § 5.02(6m), so any required information on an ID is indeed "material" to determining whether the individual is qualified to vote.

*Common Cause*, 574 F. Supp. 3d at 639 (footnote omitted) (finding that having a required form of identification was material to voting under Wisconsin law).

So too here:  Georgia's elector qualification law provides that voters must be "[p]ossessed of all other qualifications prescribed by law." O.C.G.A. § 21-2-216(a)(5).  And a pen and ink signature for the oath on the absentee ballot application is no different than requiring the voter provide a valid form of identification.

In essence, the real "thrust of plaintiffs' argument is not that the information sought by [state law] [is] immaterial, but that the likelihood of error combined with the consequences are unjustifiably burdensome on the applicant." *Fla. State Conf. of NAACP,* 522 F.3d at 1175. Yet, as noted above, requiring a voter to sign the oath with pen and ink on the absentee-ballot application does not burden the right to vote, let alone deny that right. Indeed, Plaintiffs do not identify a single qualified voter ever denied the opportunity to vote due to the pen and ink requirement. With the incidents of rejected ballot applications for failure to comply with the pen and ink signature oath requirement exceedingly rare, voters are simply not burdened by this requirement. SUF ¶¶ 50, 207 (Brittian 30(b)(6) 78:4–9; Grimmer 20:3–10; Grimmer Rep. ¶¶ 16–17 & tbl. 1).

In short, either (1) the Materiality Provision does not apply because the pen and ink requirement on the absentee ballot application is not used to disqualify a voter or deny the individual the right to vote, or (2) the requirement *is* material because it is a requirement under State law for obtaining an absentee-by-mail ballot while serving various compelling state interests. Under either view, Plaintiffs cannot establish a material issue of fact as to the lawfulness of this provision, and State Defendants are entitled to summary judgment.

## CONCLUSION

The pen and ink rule is a scientifically supported safeguard of election integrity.  And, despite Plaintiffs' speculative fearmongering, it has satisfied Georgia voters, who have complained far less than in prior years and not at all regarding the pen and ink signature requirement.  Indeed, Plaintiffs could not show a single person harmed by the rule among their tens of thousands of members.  Most of their witnesses were *not even aware* of the rule until joining this lawsuit.  Nor could sophisticated organizations with eight- or nine-figure annual budgets produce a single document showing any diversion of resources due to the rule.  If States cannot enact a rule this important and unintrusive, they have effectively lost any right to safeguard the order and integrity of their elections—as even Plaintiffs seem to acknowledge, *see* SUF ¶ 159 (Hailey 30(b)(6) 55:16–24) (admitting to "constantly evaluating" filing lawsuits in "virtually every state").

For the foregoing reasons, State Defendants' motion for summary judgment should be granted.

March 7, 2024

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580

Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
H. Christopher Bartolomucci*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Miranda Cherkas Sherrill
Georgia Bar No. 327642
Aaron Ward*
Andrew Strain*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com

41

Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Under L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr