# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

VOTE.ORG, *et al.*,

    Plaintiffs,

    v.

GEORGIA STATE ELECTION
BOARD, *et al.*,

    Defendants,

GEORGIA REPUBLICAN PARTY,
INC., *et al.*,

    Intervenor-Defendants.

Civil Action No.: 1:22-cv-01734-JPB

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................1

I.   Plaintiffs have standing to challenge the pen and ink rule...............................1

   A.  CWA and the Alliance have associational standing...................................1

   B.  Vote.org and Priorities USA have organizational standing. .....................4

   C.  Vote.org and Priorities USA have third-party standing. ...........................7

   D.  Plaintiffs have standing to seek relief against State Defendants...............9

   E.  Plaintiffs have standing as to Fulton and DeKalb Defendants................10

II.  Sovereign immunity does not bar Plaintiffs' claims against the State Election Board. ............................................................................................11

III.  Plaintiffs are entitled to summary judgment on the merits. ...........................13

   A.  The materiality provision applies to the pen and ink rule.......................13

   B.  Rejecting an absentee ballot application for noncompliance with the pen and ink rule denies the statutory right to vote. .........................................17

   C.  A handwritten signature on an absentee ballot application is not material in determining a voter's qualifications. ...................................................21

CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Priv. Clinic Mgmt. LLC v. Berry*,
   912 F.3d 1330 (11th Cir. 2019) .......................................................................9

*Ala. State Conf. of NAACP v. Alabama*,
   949 F.3d 647 (11th Cir. 2020) ...................................................................11, 12

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)........................................................................................24

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) .......................................................................6

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
   515 U.S. 687 (1995)........................................................................................14

*Bethesda Lutheran Homes & Servs., Inc. v. Leean*,
   154 F.3d 716 (7th Cir. 1998) .........................................................................11

*Burdick v. Takushi*,
   504 U.S. 428 (1992)........................................................................................24

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F.3d 1349 (11th Cir. 2005) .......................................................................3

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)..........................................................................................6

*Common Cause v. Thomsen*,
   574 F. Supp. 3d 634 (W.D. Wis. 2021) ..........................................................13

*Common Cause/Ga. v. Billups*,
   554 F.3d 1340 (11th Cir. 2009) ....................................................................3, 4

*Craig v. Boren*,
   429 U.S 190 (1976)...........................................................................................8

*Curling v. Raffensperger*,
1:17-CV-2989-AT, 2023 WL 7463462
(N.D. Ga. Nov. 10, 2023) ....................................................................11

*Doby v. DeCrescenzo*,
171 F.3d 858 (3d Cir. 1999) ...............................................................11

*Equal Rts. Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ............................................................7

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .................................................................8

*Finn v. Cobb Cnty. Bd. of Elections & Registration*,
No. 1:22-CV-02300-ELR, 2023 WL 6370625
(N.D. Ga. July 18, 2023) .....................................................................10

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ........................................................4, 7

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) .............................................................10

*In re Georgia Senate Bill 202*,
No. 1:21-CV-01259-JPB, 2023 WL 5334582
(N.D. Ga. Aug. 18, 2023) ............................................................*passim*

*La Unión del Pueblo Entero v. Abbott*,
No. 5:21-cv-844-XR, 2023 WL 8263348
(W.D. Tex. Nov. 29, 2023) ...............................................13, 14, 20, 24

*Lac du Flambeau Band of Lake Superior Chippewa Indians v.*
*Coughlin*,
599 U.S. 382 (2023) ............................................................................12

*League of Women Voters of Ark. v. Thurston*,
No. 5:20-CV-05174, 2023 WL 6446015
(W.D. Ark. Sept. 29, 2023) .................................................................13

*Liebert v. Wis. Elections Comm'n*,
No. 23-CV-672-JDP, 2024 WL 181494
(W.D. Wis. Jan. 17, 2024) ...................................................................12

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga. 2018) ................................................................13

*Mata Chorwadi, Inc. v. City of Boynton Beach*,
  66 F.4th 1259 (11th Cir. 2023) ............................................................................7

*Mi Familia Vota v. Fontes*,
  No. CV-22-00509-PHX-SRB, 2024 WL 862406
  (D. Ariz. Feb. 29, 2024) ......................................................................................22

*Migliori v. Cohen*,
  36 F.4th 153 (3d Cir. 2022) .................................................................................13

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
  97 F.4th 120 (3d Cir. 2024) .........................................................................*passim*

*Powers v. Ohio*,
  499 U.S. 400 (1991) ..............................................................................................9

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ............................................................................................17

*Ritter v. Migliori*,
  142 S. Ct. 1824 (2022) ..................................................................................23, 24

*Roberts v. Kahl*,
  No. 1:19-CV-1846-TWT, 2020 WL 4577714
  (N.D. Ga. June 12, 2020) .....................................................................................2

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003) ...........................................................15, 16, 18

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ..............................................................................................8

*Tex. Democratic Party v. Hughs*,
  860 F. App'x 874 (5th Cir. 2021) ......................................................................12

*United States v. Classic*,
  313 U.S. 299 (1941) ............................................................................................17

*Vote.org v. Byrd*,
    No. 4:23-cv-111-AW-MAF, 2023 WL 7169095
    (N.D. Fla. Oct. 30, 2023) ...................................................................23

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) .......................................................*passim*

*Wasser v. All Mkt., Inc.*,
    329 F.R.D. 464 (S.D. Fla. 2018) ..........................................................6

*Wilding v. DNC Servs. Corp.*,
    941 F.3d 1116 (11th Cir. 2019) .........................................................10

*Young Apartments, Inc. v. Town of Jupiter*,
    529 F.3d 1027 (11th Cir. 2008) ...........................................................8

## Statutes

52 U.S.C. § 10101 ..............................................................................*passim*

52 U.S.C. § 10301(b) ................................................................................18

Fed. R. Evid. 702 .....................................................................................25

O.C.G.A. § 21-2-221.2 .............................................................................23

O.C.G.A. § 21-2-381(a)(1)(A) ...................................................................2

O.C.G.A. § 21-2-386 .................................................................................20

## Other Authorities

Local Rule 56.1(B)(3) .................................................................................2

**INTRODUCTION**

State Defendants and Intervenors ("Defendants") refuse to engage with the clear language of the materiality provision, instead offering a series of conflicting narratives to attempt to justify the pen and ink rule. Their defense disregards binding precedent and the factual record. This Court's prior decision that the materiality provision applies to absentee ballot applications holds no less true today. And the record establishes that the answer to the key question—whether a pen and ink signature is material in determining a Georgia voter's qualifications—is decidedly no. What's more, though Defendants attempt to substitute undisputed testimony with facts more to their liking, the record shows that Plaintiffs have standing to make their challenge. Plaintiffs' motion for summary judgment should be granted.

**ARGUMENT**

**I.    Plaintiffs have standing to challenge the pen and ink rule.**

**A.    CWA and the Alliance have associational standing.**

CWA and the Alliance have established that they have associational standing based on their members' injuries. *See* ECF No. 159-1 at 4–8; ECF No. 196-3 at 17–19. In arguing otherwise, Intervenors grossly mischaracterize the record as to the organizations' three identified members, each of whom is plainly injured by the pen and ink rule: Mr. Isom does not feel safe voting in person due to his cancer, must exert time or money to obtain a printed absentee ballot application because he does

not have a working printer, and does not trust the postal service to timely deliver his application. Statement of Undisputed Material Facts ¶¶ 78–81, ECF No. 159-3 ("SUMF"); Isom Dep. at 22:18–23, 23:1–9, 24:1–7, ECF No. 144. Intervenors' attempt to discredit Mr. Isom's lack of trust in the postal service as "idiosyncratic" rests on a false assumption that other parts of the absentee voting process will require him to use the mail, ECF No. 186 at 5; for example, they ignore that Mr. Isom could submit his application by email, SUMF ¶ 11; O.C.G.A. § 21-2-381(a)(1)(A), and that he intends to use a drop box—not the mail—to return his ballot, Isom Dep. at 24:8–11.[1] For the same reasons, Intervenors are wrong to discount Mr. Andrews's concerns about the reliability of the postal service. ECF No. 186 at 6–7; *see also* infra 19–20 (demonstrating mail-related delays in absentee voting process). As for Ms. Simmons, Intervenors point out that she previously filled out her absentee ballot applications by hand, ECF No. 186 at 6, but disregard that she was able to pick up printed applications from the voter registration office "en route to [her] going to

---

[1] Rather than submitting a statement of additional material facts, Intervenors "presented [their] own narrative of [facts] in the body of [their] brief," *Roberts v. Kahl*, No. 1:19-CV-1846-TWT, 2020 WL 4577714, at *3 (N.D. Ga. June 12, 2020), *aff'd*, 844 F. App'x 160 (11th Cir. 2021), often without any basis in the record. *See, e.g.*, ECF No. 186 at 5 (claiming Mr. Isom "would necessarily have to trust the mail to deliver both his application and ballot" without citation to the record). These additional or conflicting facts should not be considered. *Kahl*, 2020 WL 4577714, at *3 (citing N.D. Ga. L.R. 56.1(B)(1); 56.1(B)(2)(a)(2)). If the Court does consider them, it should permit Plaintiffs to object under Local Rule 56.1(B)(3)(b)&(c). *See, e.g.*, Isom Dep. at 24:8–11 (testifying he plans to return his ballot via drop box).

work in the past years." SUMF ¶ 77; Simmons Dep. at 20:5–14, ECF No. 148. She is now retired and would have to make an independent trip. *Id.* at 8:16–19.

It is undisputed that Mr. Isom, Ms. Simmons, and Mr. Andrews must expend time and resources to obtain a printed absentee ballot application to comply with the pen and ink rule. State Defendants' assertion that none of these voters "ha[s] the ability to digitally sign or add an imaged signature to an application" ignores the record, including the testimony they cite. *See* ECF No. 190 at 4 (citing Andrews Dep. at 35:10–13, ECF No. 138 (testifying only that he has not previously completed "anything related to voting" "with an electronic signature")); *see also* Response to Defendants' Statement of Undisputed Material Facts ¶¶ 52, 101, ECF No. 191-1 ("PRDSMF"); Andrews Dep. at 47:1–12 (testifying that his smartphone "serves all [his] needs"); *id.* at 43:16–44:7 (testifying about using electronic signatures).

As for State Defendants' insistence that CWA and the Alliance must show that their members "have or will be denied the right to vote," ECF No. 190 at 8, the Eleventh Circuit has rejected that theory. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."). It is well established that even a plaintiff who is able to comply with an unlawful voting rule still has standing to challenge it. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (holding plaintiffs have standing to challenge photo identification rule under materiality

provision and other federal laws "regardless" of whether they are "able" to comply with the rule); *see also id.* at 1352 ("The inability of a voter to pay a poll tax, for example, is not required to challenge a statute that imposes a tax on voting." (citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966))).

### B.   Vote.org and Priorities USA have organizational standing.

Vote.org and Priorities USA, too, have established injuries sufficient for standing. *See* ECF No. 159-1 at 8–11; ECF No. 196-3 at 4–12. It is undisputed, for instance, that Vote.org will launch and scale a print-and-mail program in response to the pen and ink rule. SUMF ¶¶ 46, 55; Hailey Dep. at 42:10–19, 153:4–10, 165:7–25, ECF No. 143. That program will require resources, including costs for printing, postage, tracking, and sending text reminders. *See* SUMF ¶¶ 47–50; Hailey Dep. 80:1–8, 135:5–136:25. State Defendants' contrary conclusion that running such a program requires no additional resources not only contradicts unrebutted testimony, but also rests on the nonsensical assumption that contracting with a vendor to print and mail thousands of applications is entirely costless. ECF No. 190 at 5–6. There is no basis in fact or law to accept this implausible theory. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) ("[T]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007))). And contrary to State Defendants' claim that

4

"Vote.org is unable to identify any project it diverted resources *from* to cover this cost," ECF No. 190 at 6, the record shows that the print-and-mail program will force Vote.org to divert resources from mission-critical projects like college campus programs; influencer programs; and radio, text, and email campaigns, SUMF ¶¶ 50–51; Hailey Dep. at 135:5–136:25, 148:7–12.

Similarly, Priorities USA had to alter and lengthen a digital ad program because of the pen and ink rule, to provide "extra runway" for voters to apply for absentee ballots or make other plans to vote in the December 2022 runoff. SUMF ¶ 62; Grimsley Dep. at 35:8–36:13, 44:19–25, 45:19–46:10, ECF No. 142. This testimony refutes Intervenors' argument that "it is unlikely and unproven that PUSA will need to divert additional resources to address the Rule in the future." ECF No. 186 at 9. In fact, Priorities will be forced to divert money and time to customize future digital ads designed to ensure Georgia voters are equipped to navigate hurdles the pen and ink rule imposes. SUMF ¶ 66; Grimsley Dep. at 60:5–61:8, 94:16–95:20.[2] State Defendants urge the Court to ignore this evidence because it was not accompanied by documents, but they cite no authority for their proposed evidentiary

---

[2] State Defendants, too, mischaracterize the record when they contend that Priorities "could not even confirm that the rule was specifically discussed" for the ad. *See* ECF No. 190 at 7 (citing Grimsley Dep. at 74:3-75:2). In the very testimony they cite, Priorities' COO testified that she did not have documentation or recollection of "a specific discussion" but nonetheless confirmed that Priorities considered the pen and ink rule to determine the length of its ad buy. Grimsley Dep. at 74:3-75:2.

standard, which is entirely foreign to the standing analysis. Indeed, courts routinely rely on deposition testimony to establish standing. S*ee, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (finding deposition testimony sufficient to establish organizational standing based on diverted resources). Nor is there any requirement that an organization's diversion of resources directly reference the law that Plaintiffs challenge. *Contra* ECF No. 190 at 7.

Intervenors' argument that both organizations' injuries are "self-inflicted" similarly misses the mark. ECF No. 186 at 8–12. Unlike in *Clapper* and *Wasser*, Plaintiffs here undertook the print-and-mail program and the longer advertising campaign in direct response to the pen and ink rule's ongoing impact on their missions. *Contra Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding that plaintiffs cannot "manufacture standing" by incurring costs in response to "fears of hypothetical future harm that is not certainly impending"); *Wasser v. All Mkt., Inc.*, 329 F.R.D. 464, 471 (S.D. Fla. 2018) (holding plaintiffs cannot "manufacture standing" by choosing to injure themselves because of past deception that is no longer occurring). And Intervenors' suggestion that Vote.org's print-and-mail program is duplicative of state programs is purely conjecture. For this proposition, they cite testimony from *only one county*, which testified that it mails applications upon request but said nothing about the pre-paid postage or application tracking that Vote.org's program provides. ECF No. 186 at 9–10; SUMF ¶ 48; Hailey Dep. at

6

43:5–22. In any event, Vote.org's diversion of resources is a concrete injury regardless of any other organization's efforts. *See Browning*, 522 F.3d at 1166 (rejecting argument that "voluntary" diversions of resources are not injuries); *see also Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (the "standing analysis [does not] depend on the voluntariness or involuntariness of the plaintiffs' expenditures"). Both organizations have shown concrete injuries.

## C.    Vote.org and Priorities USA have third-party standing.

Vote.org and Priorities USA may enforce the rights of individual voters. *See* ECF No. 159-1 at 11–13; ECF No. 196-3 at 19–24. State Defendants erroneously rely on *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1266 (11th Cir. 2023), to argue that Plaintiffs' injury lacks a "causal connection" to any injury to voters, ECF No. 190 at 7–8, but *Mata Chorwadi* is a First Amendment case in which no party briefed third-party standing. 66 F.4th at 1265. And contrary to State Defendants' assertion, the Eleventh Circuit never held that "a litigant asserting third-party standing must show that 'the statutory provision at issue imposed a duty on the litigant and the litigant's compliance with that duty indirectly violated third parties' rights.'" ECF No. 190 at 7. Rather, it described such conditions as *sufficient* for third-party standing and rested its conclusion that the plaintiff lacked third-party standing on a "misalignment" between the third parties' interests and its own. *Mata Chorwadi*, 66 F.4th at 1266.

7

There is no such misalignment here. Both Vote.org's and Priorities USA's missions are to ensure their users and constituents can exercise their right to vote, SUMF ¶¶ 41, 58; Hailey Dep. at 35:14–18; Grimsley Dep. at 35:1–14; 39:1–5; 50:21–51:4, 101:21–24, and they act on such voters' behalf in the same manner courts have held sufficient to satisfy the "close relationship" element of the third-party standing test.[3] And State Defendants' claim that neither organization could identify anyone burdened by the pen and ink rule simply ignores the record. *See*, *e.g.*, PRDSMF ¶¶ 145, 188, 189; Grimsley Dep. at 69:21–70:3 (referring to impacted voters referenced in Dr. Mayer's report).

Vote.org and Priorities USA have also shown that their users and constituents are "hindered" from protecting their own interests. This is not because of the burdens that the pen and ink rule itself imposes, *contra* ECF No. 186 at 11–12, but because of barriers to individual voters *litigating* those burdens. For example, many voters will not become aware of the pen and ink rule until it is too late to obtain relief. *Cf. Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (holding plaintiffs had third-party standing where third parties' claims faced "obstacle" of "imminent mootness"); *Craig*, 429 U.S. at 192 (similar). Relatedly, the individual burdens of complying

---

[3] *See, e.g.*, *Craig v. Boren*, 429 U.S 190, 195 (1976); *Vote.org v. Callanen*, 89 F.4th 459, 468, 472 (5th Cir. 2023); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011); *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1042 (11th Cir. 2008).

with the pen and ink rule—though sufficient for standing—pale in comparison to the burdens of litigation, leaving voters with little incentive to pursue legal action. *Cf. Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding plaintiff had third-party standing where third parties "possess[] little incentive . . . to vindicate [their] own rights" due to "small financial stake involved and the economic burdens of litigation").

Finally, State Defendants raise a cursory "statutory standing" argument, ECF No. 190 at 9, but rely solely on a case that did not consider statutory standing at all. *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339–40 (11th Cir. 2019). This Court and others have found organizations may enforce the materiality provision, and State Defendants offer no persuasive reason to depart from those rulings. *E.g.*, *Callanen*, 89 F.4th at 471–73; *In re Georgia Senate Bill 202* ("*S.B. 202*"), No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *3 (N.D. Ga. Aug. 18, 2023).

**D.    Plaintiffs have standing to seek relief against State Defendants.**

State Defendants' traceability and redressability arguments are misplaced. First, State Defendants misunderstand the nature and scope of Plaintiffs' requested injunctive relief. *See* ECF No. 190 at 9–10. Far from seeking that State Defendants issue regulations contrary to state law, Plaintiffs ask only that they be enjoined "from implementing, enforcing, or giving any effect to the pen and ink rule and any other provisions requiring a voter to sign an absentee ballot application with pen and ink." ECF No. 96 at 18. Although counties process absentee ballot applications, State

Defendants play an essential role in enforcing the pen and ink rule through their authority to adopt regulations enforcing it and their power to compel county compliance. *See* ECF No. 196-3 at 13–15. "[T]he presence of multiple actors in a chain of events that lead[s] to the plaintiff's injury does not mean that traceability is lacking with respect to the conduct of a particular defendant." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 927 (11th Cir. 2023). And an injunction preventing State Defendants from implementing the rule through any of the coercive means at their disposal would provide at least some redress for Plaintiffs' injuries. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019) (holding injunction providing only "partial" relief "would sufficiently redress . . . alleged economic harm for purposes of standing").

### E.   Plaintiffs have standing as to Fulton and DeKalb Defendants.

Fulton and DeKalb Defendants do not dispute that they enforce the pen and ink rule by rejecting non-compliant absentee ballot applications. *See* ECF No. 178 at 2; ECF No. 182 at 4. Nor do they contest that a court order enjoining these actions would redress Plaintiffs' injuries. Instead, they insist that they are simply following the law. *See id*. But the traceability and redressability analyses focus not on who passed the law, but rather on who implements and enforces it. *See, e.g.*, *Finn v. Cobb Cnty. Bd. of Elections & Registration*, No. 1:22-CV-02300-ELR, 2023 WL 6370625, at *6 (N.D. Ga. July 18, 2023), *appeal dismissed*, No. 23-13439, 2024 WL 470345

(11th Cir. Jan. 19, 2024). The cases Fulton Defendants cite do not suggest otherwise. *See Curling v. Raffensperger*, 1:17-CV-2989-AT, 2023 WL 7463462, *40 (N.D. Ga. Nov. 10, 2023) (finding no traceability where county defendants did not enforce or implement the challenged uniform statewide voting system determined solely by Secretary of State); *see also Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998) (not considering traceability); *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (same).

## II. Sovereign immunity does not bar Plaintiffs' claims against the State Election Board.

This Court should reject State Defendants' belated argument that sovereign immunity bars Plaintiffs' claims against the State Election Board. ECF No. 190 at 11–12. Congress unequivocally expressed its intent to abrogate sovereign immunity when it enabled private individuals to sue state actors for violating the materiality provision. *See* 52 U.S.C. § 10101(a)(2)(B), (d). And Defendants do not argue that any waiver of sovereign immunity would exceed Congress's constitutional power.[4]

---

[4] Even if Defendants had raised this argument, it would fail. In enacting the materiality provision, Congress sought to prohibit election officials "from using immaterial omissions, which were historically used to prevent racial minorities from voting, from blocking *any* individual's ability to vote"; "[t]hat prohibition is a congruent and proportional exercise of congressional power" under the Fourteenth and Fifteenth Amendments. *Callanen*, 89 F.4th at 486–87. And as the Eleventh Circuit noted, both the Fourteenth and Fifteenth Amendments "permit[] Congress to abrogate state sovereign immunity." *Ala. State Conf. of NAACP*, 949 F.3d at 654.

State Defendants cite two unpublished and non-binding opinions to contend that sovereign immunity has not been abrogated for suits invoking the materiality provision. The first, *Texas Democratic Party v. Hughs*, 860 F. App'x 874, 877 n.3 (5th Cir. 2021), states in a single sentence in a footnote that Congress did not abrogate sovereign immunity through the Civil Rights Act. That scant reasoning is belied by the plain text of the statute. "It is implausible that Congress designed a statute that primarily prohibits certain state conduct, made that statute enforceable by private parties, but did not intend for private parties to be able to sue States." *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 652 (11th Cir. 2020), *vacated as moot*, *sub nom. Alabama v. Ala. State Conf. of NAACP*, 141 S. Ct. 2618 (2021).

In *Liebert v. Wisconsin Elections Commission*, No. 23-CV-672-JDP, 2024 WL 181494 (W.D. Wis. Jan. 17, 2024), the district court did not make any findings about Congress's abrogation of sovereign immunity; it dismissed the state election board because Plaintiffs did not "identify any reason why the commission [could] be sued." *Id.* at *3. But the reason here is clear: the materiality provision expresses Congress's intent to allow private parties to sue state entities. Congress need not use "magic[ ]words" to abrogate sovereign immunity or "state its intent in any particular way," *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023) (quotation omitted). It may express its intent by "impos[ing] direct liability on States" for violating federal rights "and explicitly provid[ing]

remedies to private parties to address violations under the statute," *Ala. State Conf. of NAACP*, 949 F.3d at 652. That is precisely what the materiality provision does. 52 U.S.C. § 10101(d) (conferring jurisdiction on district courts regardless of "whether the party aggrieved" has exhausted any administrative remedies).

## III.   Plaintiffs are entitled to summary judgment on the merits.

### A.   The materiality provision applies to the pen and ink rule.

This Court has held that under the Civil Rights Act's "plain language," an "absentee ballot application" is a "record or paper" subject to the materiality provision. ECF No. 59 at 17; *see also S.B. 202*, 2023 WL 5334582, at *9 (similar). That conclusion is correct, aligns with other decisions, and should not be disturbed.[5]

Intervenors urge the Court to reject its prior conclusions wholesale because of a recent Third Circuit opinion where a divided panel held that the materiality provision applies only during "the voter qualification [or registration] process"—a view no other circuit has adopted. *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024) ("*Pa. NAACP*"). But the

---

[5] The vast majority of courts applying the law have concluded the materiality provision extends to papers and records "requisite to voting" beyond voter registration papers alone. *See, e.g.*, *Migliori v. Cohen*, 36 F.4th 153, 162 n.56 (3d Cir.), *vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844-XR, 2023 WL 8263348, at *18–22 (W.D. Tex. Nov. 29, 2023); *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021).

majority misreads the plain language of the statute and its analysis offers little guidance for at least three reasons.

First, *Pa. NAACP* involved an error or omission on absentee ballot *envelopes*. 97 F.4th at 125. Because "[e]veryone agree[d]" that the envelope did not "relate to applying or registering to vote," the Third Circuit had to parse whether completing it is an "act requisite to voting" under the materiality provision. *Id*. at 131. This Court's job is much easier: the plain text of the law applies to paperwork "relating to any *application*, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). And as this Court has held, "the absentee ballot application squarely constitutes a 'record or paper' relating to an 'application' for voting.'" ECF No. 59 at 17; *La Unión del Pueblo Entero v. Abbot* ("*LUPE*"), No. 5:21-CV-0844-XR, 2023 WL 8263348, at *19 (W.D. Tex. Nov. 29, 2023) (same).

Second, the panel majority made at least two major textual errors. It adopted a reading that, *by the panel's own admission*, renders the phrase "other act requisite to voting" superfluous. *See* 97 F.4th at 138. And it disregarded the "expansive[]" definition of the term "vote" in the Civil Rights Act. *S.B. 202*, 2023 WL 5334582, at *9. Congress defined "vote" as "all action necessary to make a vote effective including . . . casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e). Successfully completing an absentee ballot application plainly is an act "requisite to voting." "Congress explicitly defined the operative term"—

here, "vote"—in the materiality provision, *Babbitt v. Sweet Home Chapter of Cmtys.*
*for a Great Or.*, 515 U.S. 687, 697 n.10 (1995), regardless of any invented meaning
the panel majority in *Pa. NAACP* felt could distinguish the "voter qualification
process" from the "vote-casting stage," *Pa. NAACP*, 97 F.4th at 133; *See id.* at 147
(Schwartz, J., dissenting) ("Had Congress wished to limit [the materiality provision]
to registration-related conduct alone, it could have . . . defined 'vote' more narrowly,
but it did not.").

Notwithstanding these errors, the panel's holding does grievous injury to the
Civil Rights Act. Rather than *preventing* states from denying the right to vote based
on paperwork errors that have nothing to do with a voter's qualifications, the panel's
reading goes out of its way to *condone* disenfranchisement based on such errors,
provided the state is clever enough to impose such requirements during what the
majority deems "the vote-casting stage," 97 F.4th at 133—a judicially invented term
alien to the Civil Rights Act. But in the same way that states cannot "circumvent the
Materiality Provision by defining all manner of requirements, no matter how trivial,
as being a qualification to vote," *Callanen*, 89 F.4th at 487, they also cannot erect
immaterial prerequisites to voting by declaring them unrelated to a voter's
qualifications. Congress adopted broad language in the Civil Rights Act specifically
to avoid such foreseeable trickery. *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir.
2003); *see also Pa. NAACP*, 97 F. 4th at 150 (Schwartz, J., dissenting) ("Congress's

concerns about voter discrimination did not vanish after registration.").[6]

While Defendants embrace *Pa. NAACP*'s novel distinction between "vote qualification" and "vote casting" rules, 97 F.4th at 133, they cannot decide which category absentee ballot applications fall into. When seeking to escape the materiality provision's requirements, they assert that such applications are "voting mechanics" because they are not used to determine whether an individual is qualified to vote. *See* ECF No. 156-1 at 30, ECF No. 190 at 12–14 & n.4; ECF No. 186 at 20–21. But they simultaneously argue that the pen and ink rule—which applies only to absentee ballot applications—survives Plaintiffs' challenge because it *is material* in confirming voter qualifications at the absentee ballot application stage. *See* ECF No. 156-1 at 34–35; ECF No. 190 at 21; ECF No. 186 at 21–25. These arguments are irreconcilable; such applications either are used to check voters' qualifications, or they are not. So even if the Court adopted the Third Circuit's distinction, Defendants' own position precludes any finding that absentee ballot applications are exempt from the materiality provision's requirements.

---

[6] In *Schwier*, the Eleventh Circuit explained that the materiality provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." 340 F.3d at 1294. Intervenors wrongly assert the court's use of "voter registration" limits the statute. ECF No. 186 at 17. But the court was plainly operating within the context of the facts of that case, which addressed the materiality of including social security numbers on voter registration forms.

Regardless, the relevant question is not whether absentee ballot applications are part of the "voter qualification process," but whether the pen and ink rule is material "*in determining* whether [an] individual is qualified" to vote. 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see infra* 21–22. And the undisputed evidence confirms that election officials do not use handwritten signatures in any way. SUMF ¶¶ 35–36; Brittian Dep. 40:25–41:5, ECF No. 175; Williams Dep. 73:20–75:19, ECF No. 154; Smith Dep. 40:19–41:1, 41:14–42:5, 70:16–71:9, ECF No. 149.

### B. Rejecting an absentee ballot application for noncompliance with the pen and ink rule denies the statutory right to vote.

This Court already explained that it "cannot ignore that Congress expansively defined 'voting,'" in the materiality provision, *S.B. 202*, 2023 WL 5334582, at *9; *see also* 52 U.S.C. § 10101(a)(3), (e), but Defendants do just that—they do not cite the governing definition of the right to "vote" even *once* in their responses. The statutory text could not be more clear: the term "vote" incorporates any "action required by State law prerequisite to voting" and "*having [a] ballot counted*." 52 U.S.C. § 10101(e) (emphasis added).

Intervenors have no answer to this definition, so they simply ignore it,[7] pointing instead to the Supreme Court's discussion of a vote denial claim under

---

[7] Intervenors also ignore that the *constitutional* right to vote includes "the right to have one's vote counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *see also United States v. Classic*, 313 U.S. 299, 318 (1941) (explaining that right to vote includes both "right to cast a ballot" and to "have it counted").

17

Section 2 of the Voting Rights Act. *See* ECF No. 186 at 12–13 (quoting *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021)); *see also* 52 U.S.C. § 10301(b). But that separate statutory scheme has no bearing on the claims here. Subsection (a) of the Civil Rights Act makes clear that the "term 'vote' shall have the same meaning as in subsection (e)" for "purposes *of this subsection*." 52 U.S.C. § 10101(a)(3)(A). Subsection (e) emphasizes the same point. *Id.* § 10101(e) (definition of "vote" applies "[w]hen used in the subsection"). Intervenors' effort to graft a different definition of "vote" into the Civil Rights Act simply highlights their failure to grapple that law's actual text.[8]

Having ignored the statutory language, Defendants apply their own definition of "vote" by asserting the pen and ink rule did not prevent anyone from casting a ballot, but in doing so they obscure evidence of individuals who were in fact unable to vote in 2022 because of their noncompliance with the pen and ink rule. SUMF ¶¶ 91–101; Stambler Dep. at 20:25–21:17, 21:24, 24:14–17; 25:13–16; 27:10–14, ECF No. 171; Trapp Dep. at 34:14–35:9, 28:20–29:12, 36:18–37:5, ECF No. 177.

---

[8] Intervenors appear to cite *Schwier* for the proposition that a law must "disqualify potential voters" to violate the materiality provision. *See* ECF No. 186 at 13 (quoting 340 F.3d at 1294). That decision says no such thing. The quoted language merely describes, at a high level of generality, the aims of the materiality provision. *See* 340 F.3d at 1294; *see also supra* 15–16. In any event, the court in *Schwier* remanded on the merits after finding private parties could enforce the materiality provision, and thus had no occasion to decide what substantive standard governs a claim under the law. *Schwier*, 340 F.3d at 1294–97.

For one, Defendants wrongly suggest that Sarah Stambler knowingly violated the pen and ink rule and decided not to return her cure affidavit because it was inconvenient. ECF No. 190 at 16; ECF No. 186 at 14–15. But Ms. Stambler did not "*know*[] a pen and ink signature was required." ECF No. 190 at 16; ECF No. 186 at 14. She was aware that the instructions did not permit an "electronic signature" but believed her signature sufficed because it was not typed. Stambler Dep. at 22:7–14. She received an electronic notice that her application was deficient and was sent a provisional ballot, which she promptly returned, SUMF ¶ 96; Stambler Dep. at 27:10–14; *see also id.* at 27:3–9, but the cure affidavit—which the voter must also submit in order to have their provisional ballot counted—arrived much later, and far too late to return it before the deadline. SUMF ¶ 96; Stambler Dep. at 25:13–16; 27:10–14. Although Defendants assert the County *mailed* both the provisional ballot and cure affidavit two days after Ms. Stambler submitted her initial application, Ms. Stambler testified that she *received* the documents on different dates, and the cure affidavit arrived at her campus apartment "a day or two before election day." SUMF ¶ 96; Stambler Dep. at 25:13–16; 27:10–14. At that point, it was too late for Ms. Stambler to return the cure affidavit from Maryland to Georgia in time to have her provisional ballot counted. SUMF ¶ 96; Stambler Dep. at Tr. 25:13–16. But for the pen-and-ink rule, Ms. Stambler would have received an ordinary absentee ballot and her ability to vote would not been contingent on the late-arriving cure affidavit.

19

Defendants similarly attempt to minimize Dr. Trapp's experience by suggesting she chose to return her cure affidavit, but not her provisional ballot. In fact, Dr. Trapp mailed both documents back after receiving them, but her ballot did not arrive before the deadline. SUMF ¶ 101; Trapp Dep. at 28:20–29:12, 36:18–37:5. Intervenors do not dispute that Dr. Trapp attempted to cure her pen and ink rejection, but they blame her for missing the ballot receipt deadline, ECF No. 186 at 15, even as they acknowledge that she received her cure materials just five days before the election and mailed them back once received. SUMF ¶ 101; Trapp Dep. at 36:18–37:5. Despite Dr. Trapp's diligence, her vote was not counted, SUMF ¶ 101; Trapp Dep. at 28:20–29:12, because of the pen and ink rule.

In any event, Defendants' nitpicking about what these voters *should* have done once their applications were rejected is irrelevant. "The existence of additional, more onerous procedures that voters could use to try to overcome the rejection does not negate the original denial." *LUPE*, 2023 WL 8263348, at *22–*23 & n.30.[9] And here, the opportunity to cure a rejected application does not "rehabilitate[] [a] . . .

---

[9] It is also worth noting that Georgia law does not give voters any right, or guarantee they will have an opportunity, to cure pen and ink rejections. Although the Secretary verbally instructed counties to send provisional ballots to voters with pen and ink rejections in 2022, SUMF ¶ 22; Brittian Dep. at 63:20–66:22, 68:7–19; Williams Dep. at 112:13–113:8, such opportunities are not available to all voters in each election. O.C.G.A. § 21-2-386 provides a process for curing missing signatures on absentee *ballots*, but there is no binding requirement that counties offer voters the opportunity to cure signature errors on their ballot *applications*.

violation of the Materiality Provision." ECF No. 59 at 16; *see also Callanen*, 89

F.4th at 487 (expressing doubt that option to cure noncompliance with "immaterial

requirement . . . even if it is not itself a final denial," can resolve materiality provision

violation and setting aside motions-panel's holding to the same effect); *S.B. 202*,

2023 WL 5334582, at *2, 9, 11 (finding date of birth requirement violates materiality

provision notwithstanding "opportunity to cure the defect").[10]

### C.     A handwritten signature on an absentee ballot application is not material in determining a voter's qualifications.

After arguing that the materiality provision is inapplicable because absentee

ballot applications *are not used* to determine a voter's qualifications, ECF No. 186

at 20, Defendants insist that handwritten signatures on absentee ballot applications

absolutely *are* material in determining eligibility. *Id.* at 21. This confusion shows

how far Defendants must strain their arguments to evade the statute's plain language.

Defendants also entirely fail to explain how the pen and ink rule is used "*in*

*determining* whether [an] individual is qualified" to vote. 52 U.S.C.

---

[10] Beyond Ms. Stambler and Dr. Trapp, the record identifies multiple Georgia voters whose absentee ballot applications were rejected because of the pen and ink rule and who ultimately did not vote in the corresponding election. SUMF ¶¶ 89–90; ECF No. 159-19 at 6; ECF No. 159-20 at 15–16. Given the lack of uniformity in data recording across counties, Plaintiffs' experts studied only a few counties. PRDSMF ¶ 204; Mayer Dep. at 65:25–66:7, ECF No. 168; ECF No. 192-22 at 1–3. Accordingly, the figures reported by Plaintiffs' experts "almost certainly" undercount the number of impacted voters statewide. PRDSMF ¶ 204; ECF No. 192-22 at 1–3.

§ 10101(a)(2)(B). The key phrase—"in determining"—refers to an active process, and it "addresses whether the error or omission is used to ascertain or decide the voter's qualifications." *Pa. NAACP*, 97 F.4th at 153 (Shwartz, J., dissenting); *see also id.* (explaining that "'in' means 'used as a function word to indicate means or instrumentality'" (citation omitted)). It is not enough for a requirement to have tangential relevance to a voter's eligibility. Under the provision's plain text, required information must "actually impact[] an election official's determination of a person's eligibility to vote." *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *37 (D. Ariz. Feb. 29, 2024) (cleaned up).

Here, the undisputed evidence confirms election officials do not use handwritten signatures in any way. Defendants concede that "the signature is not matched against the voter's signature on file," ECF No. 190 at 21, and thus *is not used* to verify identity. *See also* SUMF ¶ 35; Brittain Dep. at 40:25–41:5; Williams Dep. at 73:20–75:19; Smith Dep. 40:19–41:1, 41:14–42:5, 70:16–71:9. Just last year, in granting a preliminary injunction, this Court held that the state's birthdate requirement on absentee ballots likely violated the materiality provision because defendants admitted that the birthdate information was "not used to determine whether a voter is qualified to vote," even though it was allegedly used to verify the voter's identity. *S.B. 202*, 2023 WL 5334582, at *8. Surely, then, a requirement that is not even used for the bare purpose of verifying identity cannot pass muster.

The out-of-circuit and non-binding cases on which Defendants rely do not rehabilitate their argument. Defendants urge this Court to adopt *Callanen*'s and *Byrd*'s conclusions, but those cases did not create a *per se* rule about the materiality of handwritten signatures. Rather, they considered the "totality of the circumstances," including the salient fact that (in both cases) the signature requirement applied to voter registration forms and was used to affirm voters' qualifications. *Callanen*, 89 F.4th at 489; *see also Vote.org v. Byrd*, No. 4:23-cv-111-AW-MAF, 2023 WL 7169095, at *6 (N.D. Fla. Oct. 30, 2023). Here, the record is clear that the pen and ink rule on absentee ballot applications is *not* used to determine voter eligibility.[11] *Callanen* and *Byrd* thus deemed the handwritten signatures material under very different circumstances.

Intervenors' reliance on Justice Alito's dissent in *Ritter v. Migliori* is likewise misplaced. ECF No. 186 at 24–25. That dissent—which garnered only three Justices' support—considered (in the abstract) whether an absentee ballot with an undated declaration on its outer envelope should be counted, but it says nothing analogous to the signature requirements on absentee ballot *applications* at issue here. *See Ritter v. Migliori*, 142 S. Ct. 1824, 1826 (2022). Justice Alito himself acknowledged that

---

[11] Georgia does not even require handwritten signatures on voter registration forms. *See, e.g.*, O.C.G.A. § 21-2-221.2 (providing procedure for electronic voter registration). Nor did it require such signatures on absentee ballot application forms before 2021.

his opinion offered mere "thoughts" on the interpretation of the materiality provision and he "d[id] not rule out the possibility that further briefing and argument might convince [him] that [his] current view is unfounded." *Id*. at 1824.

In a final attempt to dodge the materiality provision's plain text, Defendants rely on the state's interest in preserving the pen and ink rule, *see* ECF No. 186 at 21, 23; ECF No. 190 at 19, 23–24, erroneously invoking the legal standard for voting challenges under the First and Fourteenth Amendments. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But this is not a constitutional challenge. And a state's interests in enforcing a challenged law are "entirely irrelevant" to a materiality provision claim. *LUPE*, 2023 WL 8263348, at *8 ("[T]he Materiality Provision is not a burden-interest balancing statute. Materiality Provision violations are prohibited no matter their policy aim.").

In any event, Defendants fail to offer any meaningful support for their assertion that the pen and ink rule helps deter or detect voter fraud. State Defendants' proffered expert had never assessed or studied the reliability, effectiveness, materiality, or purpose of a handwritten or pen and ink signature before he was retained in this case. *See* Srivastava Dep. 200:5–201:2, ECF No. 179. In support of his opinion that "signing a physical document creates a psychological effect that increases voter honesty," ECF No. 190 at 21, Dr. Srivastava cited just three studies, all of which are inapt. The first study involved students being tested in a low-stakes

24

setting; the study's author noted that results might change in settings with higher moral or social stakes. PRDSMF ¶ 21; Srivastava Dep. at 176:24–177:20. The second study was a stripped down "replication" of the first, in which the authors stated that further research was needed to determine whether their findings applied in a "government" setting. PRDSMF ¶ 21; Srivastava Dep. at 183:17–185:16. The third study considered only the recipient's perception of the signature, not the honesty of the person signing. And Dr. Srivastava would only state that the studies were peer reviewed, but not that they were "generally accepted within the field." PRDSMF ¶¶ 32–35; Srivastava Dep. at 187:14–25.

Moreover, by his own admission, Dr. Srivastava is not an expert in "fraud detection," and so his testimony on that subject is not admissible. Fed. R. Evid. 702; PRDSMF ¶¶ 21, 27; Srivastava Dep. 111:24–112:6. Even if it were, Dr. Srivastava testified that detecting fraud as an application was processed would require comparing the application signature with one in the voter's records—the very process the legislature abolished and that counties confirmed no longer takes place. *Id.* at 111:16–22, 112:3–15.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' Motion for Summary Judgment.

Dated: May 2, 2024                      Respectfully submitted,

Adam M. Sparks                          /s/ *Uzoma N. Nkwonta*
Georgia Bar No. 341578                  Uzoma N. Nkwonta*
John F. Cartwright*                     Jyoti Jasrasaria*
KREVOLIN & HORST, LLC                   Marcos Mocine-McQueen*
1201 W. Peachtree St., NW               ELIAS LAW GROUP
One Atlantic Center, Suite 3250         250 Massachusetts Ave. NW
Atlanta, GA 30309                       Suite 400
Telephone: (404) 888-9700               Washington, D.C. 20001
Facsimile: (404) 888-9577               Telephone: (202) 968-4490
sparks@khlawfirm.com                    unkwonta@elias.law
cartwright@khlawfirm.com                jjasrasaria@elias.law
                                        mmcqueen@elias.law

                                        *Admitted *pro hac vice*

        *Counsel for Plaintiffs*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing **Plaintiffs' Reply in Support of their Motion for Summary Judgment** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using font type of Times New Roman and a point size of 14.

Dated: May 2, 2024                     /s/ *Uzoma N. Nkwonta*
                                       Uzoma N. Nkwonta
                                       *Counsel for Plaintiffs*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing **Plaintiffs' Reply in Support of their Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.


Dated: May 2, 2024                    /s/ *Uzoma N. Nkwonta*
                                      Uzoma Nkwonta
                                      *Counsel for Plaintiffs*

28